UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                 Case No. 8:04-CR-348-T-24TGW
-vs-                            20 October 2006
                                 Tampa, Florida
                                 9:30 a.m.

RONALD J. TRUCCHIO
 a/k/a RONNIE ONE ARM
steven catalano
KEVIN M. McMAHON
TERRY L. SCAGLIONE,
      Defendants.
-------------------------------/

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:          DENNIS MOORE, ESQUIRE
                               JAY G. TREZEVANT, ESQUIRE
                               Assistant United States Attorneys
                               United States Attorney's Office
                               400 North Tampa Street, Suite 3200
                               Tampa, Florida 33602
                               (813) 274-6000

For the Defendant
 Ronald Trucchio:          JOSEPH R. COROZZO, ESQUIRE
                               Rubinstein & Corozzo, PC
                               260 Madison Avenue
                               New York, New York 10016
                               (212) 545-8782

For the Defendant
 Steven Catalano:          THOMAS OSTRANDER, ESQUIRE
                               Law Office of
                                 Thomas H. Ostrander, P.A.
                               516 10th Street West
                               Bradenton, Florida 34205
                               (941) 746-7220

PAUL K. SPANGLER, RPR, RMR, CRR
OFFICIAL UNITED STATES COURT REPORTER

1    A    East to West is 101st Avenue.  This here is

2    83rd Street.  Right here is 84th Street.

3    Q    Are there any landmarks that help you recognize the

4    area, sir?

5    A    This here is a junior -- an elementary or a junior high

6    school.

7         This is a park.

8    Q    Did you used to hang out in the park?

9    A    Used to play ball there on and off.

10   Q    Now, from this map can you tell us approximately where

11   the P.M. Pub was located?

12   A    The P.M. Pub would be located right here.

13   Q    How long were you associated in a crew that involved

14   John Alite, Joe O'Kane and Joseph Stabile?

15   A    On and off, '86, '87, '88 and '89.

16   Q    And during that period of time was there any particular

17   location that was a base of operations for that crew?

18   A    P.M. Pub.

19   Q    Were there any particular leaders within the P.M. Pub

20   that you met with frequently?

21   A    Let's get to the point.  Uh, Ronnie Trucchio, that was

22   his main headquarters.  John Alite, that was his --

23   75 percent of his main headquarters.

24   Q    Could you describe for the jury your relationship in

25   criminal activity, generally, with Mr. Alite and/or

②

1    Mr. Trucchio.

2              MR. COROZZO:   Objection to the form, Your Honor.

3              THE COURT:   Yes.   I will sustain.

4              Why don't you ask --

5    BY MR. TREZEVANT:

6    Q    I'll ask a different question.

7         Was John Alite involved in criminal activity during

8    that period, sir?

9    A    Yes, he was.

10   Q    Were you involved in criminal activity during that

11   period?

12   A    Yes, I was.

13   Q    Was your activity with John Alite?

14   A    Yes.

15   Q    And was it with Ronald Trucchio?

16   A    Yes.

17   Q    While you were in a crew with John Alite and

18   Mr. Trucchio, was anyone -- in particular, generally -- a

19   leader of the crew?

20   A    There was over a dozen people in the crew.   And the

21   known leaders would be John Alite, and his partner was

22   Ron Trucchio.

23   Q    And generally how were decisions made?

24        Based upon your observation, how -- how were decisions

25   made?

1      When you -- when you received instructions or you had

2    discussions generally, what was -- what did you observe

3    concerning Mr. Trucchio and Mr. Alite being in charge of

4    that crew?

5    A      Mostly everything -- everything that we did went

6    through -- through Alite, through John.  And all -- most of

7    the deals also, if Ronnie had something to say or had part

8    of the involvement in it, it went to Alite, and Alite would

9    bring it to us.

10      And at times Ronnie would make suggestions, or -- or

11    point in direction certain things that had to be done, or

12    certain directions had to go on.

13    Q      And during that period of time, how often would you be

14    able to find Mr. Trucchio in the P.M. Pub?

15    A      Daily.

16    Q      And did you, yourself, go to the P.M. Pub?

17    A      Daily.

18    Q      And when you went there, did you ever have discussions

19    with Mr. Trucchio?

20    A      On and off.

21    Q      Now, without going into great detail, because we'll get

22    into it as we move along, what, if any, types -- what

23    would -- if any, were the main types of criminal activity

24    engaged in by that crew?

25    A      Narcotics.



1  release, did you at any time participate in the shooting of

2  any individual?

3  A    In 1986?

4  Q    In late '85 or early 1986.

5  A    Yes.

6  Q    Did anyone die as a result of the shooting?

7  A    No.

8  Q    As far as you know, have you ever committed a violent

9  act that led to a person's death?

10  A    No.

11  Q    But did you participate in the shooting?

12  A    Yes.

13  Q    Who was shot, sir?

14  A    Are we talking about a situation, uh, Michael --

15  Q    Sir, but the question was, who was shot?

16  A    This shooting we're talking about was Michael Livigni.

17  Q    All right.

18       Did you participate in the planning that led up to the

19  shooting?

20  A    Yes.

21  Q    What was the location of the planning that led up to

22  the shooting?

23  A    There was several locations.  Uh, P.M. Pub,

24  John Alite's family home, Joseph O'Kane's family home.

25  Joseph Stabile's mother's home.

1   Q    At the P.M. Pub, uh, did you participate in

2   conversations concerning the shooting of Mr. Livigni, the

3   planning of it?

4   A    Yes.  Yes.

5   Q    Who was present for those discussions?

6   A    Defendant, Ronald Trucchio, John Alite, Joseph Stabile

7   and Joseph O'Kane.

8   Q    Could you describe for the jury the inside of the

9   P.M. Pub, generally.

10  A    The door's on the right-hand side.  When you walk in,

11  to the left there's a bar about 12 feet long.  On the

12  right-hand side past the bar would be a pool table.  Juke

13  box -- the juke box was in the front.  Had a storage room to

14  the left, bathroom towards the back.

15       That's the best I could remember.  It's been a long

16  time.

17  Q    The discussions concerning the shooting of Mr. Livigni,

18  do you recall where in the bar the discussion took place?

19  A    Towards the back where the storage room was.

20  Q    And who was present, sir?

21  A    As I said again, Ronald Trucchio, John Alite,

22  Joseph O'Kane, Joseph Stabile.

23  Q    And at the time, what did you, yourself, personally,

24  actually know about Mr. Livigni?

25  A    Hum, he was a member -- he was a person who hung out at

1  the P.M. Pub.  He lived on 78th -- what I know about Mike,

2  lived on 78th Street off of 101st Avenue.  A little older

3  than me.  He hung out at the P.M. Pub.  He was, you know,

4  very well known in the neighborhood, very friendly,

5  associated with all the guys in the neighborhood.  He grew

6  up there.

7  Q    Could you physically describe what he looked like.

8  A    Darkish hair, chunky -- at that time, chunky.  Decent

9  looking fellow, very friendly.

10 Q    Did you have any problem with Mr. Livigni at the time?

11 A    I hardly knew him.

12 Q    When it was discussed to -- that it -- that there was

13 going to be a shooting of Mr. Livigni in the P.M. Pub, uh,

14 was any explanation given as to why Mr. Livigni was to be

15 shot?

16 A    Well, what I was told, from my understanding, was

17 that --

18        MR. COROZZO:  Objection to the compound answer,

19 Your Honor, and if it's what he's told, the source.

20        MR. TREZEVANT:  Yes, sir.

21        I can take it step by step, Your Honor.

22        THE COURT:  All right.

23 BY MR. TREZEVANT:

24 Q    In the back of the P.M. Pub, planning to shoot

25 Mr. Livigni, who was present?

⑦

1  A    Again, Ron Trucchio, John Alite, Joseph Stabile and

2  Joseph O'Kane.

3  Q    And yourself; is that --

4  A    And myself, correct.

5  Q    While the five of you are in the back of the P.M. Pub

6  discussing the shooting of Mr. Livigni, are you told

7  anything as to why Mr. Livigni is to be shot?

8  A    I was told why before that.

9  Q    But at this time -- we'll get to that -- but at this

10  time were you told why?

11  A    No.  Just at this time, just that he has to be found,

12  and when he's found, let's get this going.

13  Q    Okay.

14        And who said that, sir?

15  A    Really, Alite was in charge of the conversation.

16  Ronnie was talking about things, and Joseph O'Kane, mostly.

17  Q    What, if anything, did Mr. Trucchio say about it?

18  A    He just wanted to know what was -- he was more

19  concerned about why things weren't happening.

20  Q    When you say "why things weren't happening," why what

21  wasn't happening?

22  A    Alite took offense to --

23  Q    I'm sorry --

24        MR. COROZZO:  Your Honor, I object to interrupting

25  the witness.  The witness was giving an answer, and

1    Mr. Trezevant is not happy with the answer and --

2         MR. TREZEVANT:  No, no, no, Your Honor, I'm trying

3    to direct him to answer my question, is what I was going to

4    ask him to do.

5         THE COURT:  All right.  Well, let's try it again,

6    then.

7         What is the question?

8    BY MR. TREZEVANT:

9    Q    Okay.  Now --

10   A    Let's go back to the question.

11   Q    Mr. Ciaccio, I will ask the question.  And just listen

12   to the question, and just answer the question, and then we

13   can elaborate.

14        First, when Mr. Trucchio said -- was talking about why

15   things weren't getting done, what was he talking about?

16        What was -- what was the topic of the conversation?

17        What wasn't getting done?

18   A    While at the P.M. Pub the conversation was brought

19   up -- like we went there at the time --

20        The question was what?

21        MR. COROZZO:  Your Honor, again, I think one of

22   the problems with the people talking over each other is that

23   the witness is being interrupted when he's giving answers.

24        MR. TREZEVANT:  I -- just didn't want him to

25   ramble on, Your Honor, and make it more difficult.

9

1        Go ahead.

2        THE COURT:  You've either got to let him answer

3   the question or ask another question, or ask a more specific

4   question.

5   BY MR. TREZEVANT:

6   Q    Yes, ma'am, I will.

7        Go ahead, Mr. Ciaccio, explain what happened at the

8   P.M. Pub.

9   A    At this moment I was -- we were driven there, myself,

10  Joe O'Kane and Joseph Stabile; arrived at the P.M. Pub to

11  meet John Alite for daily -- you know, just daily

12  activities, daily business, hello, how are you doing?

13       Ronnie Trucchio is there, and the conversation turned

14  into somebody found out that they knew Mike was in the area,

15  Mike Livigni.  John Alite was upset because of the

16  disrespect that was given to Ronald Trucchio -- from my

17  understanding and what was told to me from John Alite and

18  Joseph O'Kane themselves -- that Michael Livigni

19  disrespected Ronald Trucchio at some point by either raising

20  his hands, or disrespecting him, you know, with his voice.

21       And John Alite took this as very disrespectful and was

22  very upset about this.  So, the conversation was that when

23  we get ahold of him, or we could find Mike Livigni, you

24  know, John Alite was going to take control and do whatever

25  has to be done.  And everybody seemed happy about that.  It

1    was just a macho thing.  Everybody -- you know, it was a

2    beautiful thing.  Let's go do what has to be done.

3    Q    All right.

4         Now, that conversation, where was that conversation?

5    A    That first conversation was held that -- at the

6    P.M. Pub, and I learned about this situation from

7    John Alite.

8    Q    And you said you had conversations with Mr. Alite

9    earlier about that?

10   A    Well, that was the first conversation.  The first time

11   I heard about it was at the P.M. Pub.

12   Q    Was there any further discussion concerning

13   Mr. Livigni -- the shooting of Mr. Livigni?

14   A    Yes.

15   Q    Where was that conversation?

16   A    One was at Joseph O'Kane's mother and father's house,

17   the other one was at John Alite's family's home, and another

18   one as at Joseph Stabile's home.  Joseph Stabile and his

19   family were close with Mike Livigni.

20   Q    Was there any discussion concerning Mr. Livigni when

21   you were in the P.M. Pub while Mr. Trucchio was present that

22   it was clear that Mr. Livigni was to be shot?

23            MR. COROZZO:  Objection, Your Honor.  Extremely

24   leading.

25            THE COURT:  Yes.

1           Rephrase.

2    BY MR. TREZEVANT:

3    Q    Was Mr. Trucchio present during these discussions

4    concerning the shooting of Mr. Livigni?

5    A    Yes, he was.  At that conversation, yes.

6         Uh, can I correct?  There was -- it wasn't that there

7    was going to be a shooting, it was that something had to

8    happen, and it turned out to be a shooting.

9    Q    Now, was there a period of time when you all were

10   looking -- when you, Mr. Alite -- you said you were looking

11   for Mr. Livigni?

12   A    Yes.

13   Q    And at some point was he located?

14   A    Yes, he was.

15   Q    Where was he located?

16   A    He was located at a place called Port O' Call's Bar.

17   Q    And what, if anything -- not the details, we'll get to

18   that -- but just generally what happened at the

19   Port O' Call, if anything?

20   A    Concerning the shooting?

21   Q    Yes.

22   A    Okay.  Well, we went into the Port O' Call's Bar.  He

23   was there.  And we walked in, surrounded him.  John Alite

24   pulled out a weapon and pointed it at Livigni and pulled the

25   trigger.  Shot him.

1   Q    Did you shoot Mr. Livigni?

2   A    No.  As I said, John Alite.

3   Q    Did anyone else shoot Mr. Livigni?

4   A    No.

5   Q    Do you know where the gun came from that was used to

6   shoot Mr. Livigni?

7   A    Joseph O'Kane's home.

8   Q    Could you tell the jury about that, sir.

9   A    When he was located -- almost all the time guns were in

10  somebody's car or somebody's possession.  And at this time

11  everybody had to have a gun on him.  Our last approach was

12  we had two cars, myself and Joseph Stabile in one car,

13  Joseph O'Kane and John Alite in another car.

14       Went to Joe's house, picked up another weapon.  From

15  there we proceeded to Port O' Call's, parked in front of

16  Port O' Call's, which is a bus stop.

17  Q    When you entered the Port O' Call, was it -- what

18  approximate time of the evening was it?

19  A    Before midnight.

20  Q    Did you recognize anybody in the Port O' Call?

21  A    Just the bartender.

22  Q    Did any of the four, you, Joe Stabile, Joseph O'Kane or

23  John Alite, is anybody wearing a, uh, disguise or a mask of

24  any kind?

25  A    No, not at all.

(13)

1   Q    Were there many people in the bar?

2   A    You know, everything was zoned out.  When we went in

3   there, we went with one intention and one intention only.

4   There was no having a drink, no stopping to say hello.

5   Q    When you entered the bar, where were you standing when

6   Mr. Alite shot Mr. Livigni?

7   A    We squared off -- we squared in the bar, Alite and

8   O'Kane on one side, and myself and Stabile on the other.

9   Mr. Livigni was near the bar when Alite approached him,

10  pointed the weapon and just pulled the trigger.

11  Q    Where did he shoot him, sir?

12  A    Abdomen, chest -- in the area.  Front body shot.

13  Q    In the torso, sir?

14  A    Yeah, front body shot.

15  Q    I'm showing you what's been marked as Government's 11B.

16       (Pause.)

17            MR. COROZZO:  Your Honor, may we have a sidebar,

18  please?

19            THE COURT:  Yes.

20            Just a second, let me --

21            MR. COROZZO:  Okay.

22            (Thereupon, the following conversation was had at

23  the bench:)

24            THE COURT:  Make sure I know what these are.

25            These are hospital records?

1          MR. TREZEVANT:  It is, Your Honor.  This is the

2     hospital records from Jamaica, uh, Hospital.  We filed a

3     Declaration of Authentication of Business Records.  It's

4     document number 492.  Uh, we filed it in the court record,

5     provided notice obviously to all counsel that, uh -- and

6     we've turned these records over.

7          MR. COROZZO:  That's not the issue, Your Honor.

8     The issue is why, even if this was -- is going to be

9     admitted as evidence, what's the relevance of showing it to

10    this witness?  This witness never saw the record, this

11    witness was not in the hospital.  I don't understand why

12    it's being shown to this witness.

13         THE COURT:  Well, I think it's admissible as long

14    as it's relevant, and I don't know what you're going to --

15    you're not trying to get it in through this witness, are

16    you?

17         MR. TREZEVANT:  Yeah, the -- I'm actually putting

18    it in as a business record.  Uh, it's going to show this

19    witness as something published, some of the information on

20    this document as a business record.

21         The relevancy is that it is a hospital record from

22    Michael Livigni showing the shooting on February, uh, 1 of

23    1986; uh, that he was shot with a gunshot wound to the

24    abdomen.  Uh, and, you know --

25         THE COURT:  Okay.

(14)

1          MR. TREZEVANT:  -- and he was shot.

2          THE COURT:  Okay.  The document is admissible.

3     And you don't have any --

4          MR. COROZZO:  No problem.

5          THE COURT:  -- any problem with that?  The

6     document is admissible, and then you can do whatever you

7     want to.

8          MR. TREZEVANT:  Just publish it.

9          THE COURT:  Okay.

10          MR. COROZZO:  Your Honor, I just object to it

11    coming in through this witness.  There is -- there are

12    pieces of evidence that are admissible that -- but there are

13    procedures, and to put it in through a witness who has never

14    seen it --

15          THE COURT:  Well, he could have -- he could have

16    put them all in in the beginning as long as they're --

17    they're relevant to some extent.

18          MR. COROZZO:  But this witness cannot be asked any

19    questions about this document.  If it's going to be

20    admitted --

21          THE COURT:  He can read it.  I mean, I don't

22    know -- I think he can certainly read it, I mean, if it's in

23    evidence.  I mean, he may not know anything about the

24    document, but he could read the document, Mr. Trezevant

25    could read the document.  If it's in evidence, anyone can

(15)

1    read it.

2              MR. COROZZO:  Well, then, I think we're opening

3    the door to that I can show that document to every witness

4    and let them read from it, I think it's --

5              THE COURT:  Probably could.

6              MR. COROZZO:  -- a complete waste of time.  I

7    think it's procedurally improper, and it's just misleading

8    to the jury.  It's prejudicial to the jury that this -- this

9    witness is somehow authenticating the document, or -- or

10   giving it some corroboration.

11             Uh, I just think it's -- it's procedurally

12   improper, Your Honor.

13             THE COURT:  All right.

14             I think -- I think what you ought to do is offer

15   the document in.  I'm not sure why you're showing it to him

16   to offer it in.

17             MR. TREZEVANT:  Well, because I wanted to --

18             THE COURT REPORTER:  I'm sorry, I can't hear you.

19             MR. TREZEVANT:  I wanted to make sure that

20   Mr. Corozzo knew what I was doing and that I gave it to the

21   witness.  I'm going to offer it as a business record, and

22   then that's it.

23             THE COURT:  Okay.

24             MR. TREZEVANT:  I'm not going to ask him to

25   authenticate it.

(16)

1      MR. COROZZO:  Again, my objection, Your Honor, is

2   procedurally.  You're offering it -- you're putting on the

3   record you're offering the document as a business record

4   through a witness that has nothing to do with the business

5   record of the document.

6      Uh, I would then want a curative instruction or an

7   admonition to the jury that this is coming in as a business

8   record, a business record of the hospital.  This witness has

9   never seen the document before, this witness did not

10  authenticate the document.

11     THE COURT:  Well, I don't mind the first part.  I

12  don't know if the witness has ever seen the document before

13  or not, but --

14     MR. TREZEVANT:  I don't mind the first part

15  either.

16     MR. COROZZO:  But then the witness has not drafted

17  it, has -- it is --

18     THE COURT:  -- not going to go through all that.

19  It's a business record.

20     MR. COROZZO:  That's the whole point, Your Honor.

21  By putting it in through this witness, it's completely

22  misleading to the jury.

23     THE COURT:  Well, I disagree.

24     MR. COROZZO:  It's prejudicial.

25     THE COURT:  Okay.

1          (Thereupon, the bench discussion was concluded and

2    the proceedings resumed as follows:)   (2:22 p.m.)

3          MR. TREZEVANT:  Your Honor, at this time we would

4    offer Government's 11B as a business record.

5          THE COURT:  11B being what?

6          MR. TREZEVANT:  It's a business record of

7    Jamaica Hospital, Your Honor.

8          THE COURT:  On what date?

9          MR. TREZEVANT:  It's in February of 1986.

10         THE COURT:  All right.  And I have an

11   authentication.

12         You have filed an authentication; is that correct?

13         MR. TREZEVANT:  Yes, ma'am, document 492.

14         THE COURT:  Okay.

15         I will receive into evidence then -- I'm sorry,

16   11B?

17         MR. TREZEVANT:  Yes, ma'am.

18         THE COURT:  -- 11B as a business record of

19   Jamaica Hospital.

20         (Thereupon, Government's Exhibit 11B was received

21   and filed in evidence.)

22         MR. COROZZO:  Your Honor, my understanding there's

23   going to be a curative instruction as to this witnesses's

24   knowledge and -- of this document?

25         THE COURT:  I said I'm receiving it into evidence

1   as a business record.  Now, if he wants to ask questions

2   about it, Mr. Trezevant is welcome to ask questions about

3   it.

4          MR. COROZZO:  Fine, Your Honor.

5   BY MR. TREZEVANT:

6   Q    Mr. Ciaccio, do you have Government's 11B in front of

7   you, sir?

8   A    Yes, I do.

9   Q    If we could publish 11B.

10         (Pause.)

11         Now, Mr. Ciaccio, prior to today have you ever seen

12  this document?

13  A    No, I have not.

14  Q    Did you have anything to do with creating this

15  document?

16  A    My honest opinion is --

17  Q    No, sir.

18         Yes or no, did you -- did you create this document?

19  A    No.

20  Q    Okay.

21         Now, sir, looking at the top of the document, the top

22  left corner, could you read the words right at the top left

23  corner just above the line, sir.

24  A    Admission Data.

25  Q    In the middle of the document, if you would focus your

1 attention in the -- in the -- I'll bring it up on your

2 screen.

3   (Pause.)

4   All right, sir.  Drawing your attention to the middle

5 of the document, does it identify a patient's last name

6 there?

7 A It says Michael Livigni.

8 Q Just below that is there a -- is there an address

9 there, sir?

10 A 10126 78th Street, Woodhaven, New York.

11 Q Just above the New York, two cells, is there an admit

12 date and time, sir?

13 A Repeat that again.

14   Just below the address?

15 Q Do you see where it says "Woodhaven, New York," sir?

16 A Correct, I see --

17 Q Moving up two lines, above where it says "Woodhaven,

18 New York" --

19 A Okay.

20 Q -- is -- do you see where it says --

21 A On the right-hand side, correct.

22 Q Do you see where it says, "Admit, date, dash, time"?

23 A Correct.  2/1/86.  February 1st, 1986.

24 Q Is that date of any significance to you, sir?

25 A About the time, yes.  I cannot remember the exact date.

1   Q   To the right of that, the discharge date, do you see

2   that, sir?

3   A   2/10/86.

4   Q   Moving to the top of the document, the top section in

5   handwriting, on the first line next to the number one with

6   the circle?

7   A   Yes.

8   Q   Could you read what's written there, sir.

9   A   Says, gunshot wound to abdomen and injury to

10  intestines.

11  Q   And down lower, next to "Secondary Diagnosis."

12  A   Gunshot.  Correct, gunshot.

13  Q   Now, returning back to the map of Queens.

14      (Pause.)

15      Generally speaking, sir, what streets -- on what street

16  was the Port O' Call located?

17  A   Port O' Call was located exactly on Atlantic Avenue and

18  Woodhaven Boulevard in Ozone -- that's considered Woodhaven,

19  Queens.

20  Q   All right.

21      Going up that intersection, sir, did you say that

22  Joe O'Kane resided near that intersection?

23  A   Joe O'Kane's family resided on 91st Street between -- I

24  think it was between 89th Avenue and 91st Avenue.

25  Q   Are you able to see that on this map, sir?

21

1   A    Correct.

2   Q    Could you tap your screen.

3   A    Joe O'Kane's family's home.

4   Q    And the address for Michael Livigni, was that near the

5   Port O' Call, sir?

6   A    Where Michael Livigni lived?

7   Q    Yes, the address on the record that we just -- to which

8   we were just referring?

9   A    Michael Livigni lived -- it's not on this map.  It's --

10  Michael Livigni lived down here, 78th Street.

11  Q    All right, sir.

12       Now, if Ms. Lanier could approach, Your Honor.

13       (Pause.)

14       Do you recognize that, sir?

15  A    It's Woodhaven Boulevard, Atlantic Avenue.

16  Q    Is that a photograph I just handed you, sir?

17  A    Aerial photograph, correct.

18  Q    Is it a fair and accurate depiction of the area in the

19  photograph?

20  A    Yes.  Yes, it is.

21       MR. TREZEVANT:  Your Honor, we'd offer

22  Government's 11A.

23       MR. COROZZO:  No objection, Your Honor.

24       THE COURT:  Receive into evidence 11A.

25       (Thereupon, Government's Exhibit 11A was received

1   and filed in evidence.)

2   BY MR. TREZEVANT:

3   Q    And if you would remove the blue arrows, Mr. Ciaccio.

4        Now, sir, did you indicate that when you went into the

5   Port O' Call you did not have a disguise?

6   A    No disguise.

7   Q    Were you worried about being recognized?

8   A    No.

9   Q    Could you tell this jury why not, sir.

10  A    At that time in my life I really -- you know, what I

11  was doing at the time was insane every day.  I had no

12  thoughts of any care of what was going on.  There was no

13  worries, no -- I enjoyed what we were doing.  It was -- you

14  know, I wasn't worried about anybody recognizing me.  And if

15  they did, then I'd worry about it then.

16  Q    Now, sir, on this map could you tell us -- this aerial

17  photograph -- what are we looking at?

18  A    Looking at Atlantic Avenue, which is going East to

19  West.

20  Q    Could you show us.

21  A    It's a two-way street, East to West, Atlantic Avenue.

22  This is Woodhaven North to South, which was also two-way

23  traffic.

24  Q    If you could now remove those marks.

25       And are you able to recognize the general location of

1    the Port O' Call on this aerial photograph, sir?

2    A    Exactly.

3         Port O' Call -- that's the Port O' Call bar right on

4    the corner.

5    Q    When you traveled to the Port O' Call to shoot

6    Mr. Livigni, the four of you all, how many cars did you all

7    take, sir?

8    A    Two cars.

9         MR. COROZZO:  Objection, Your Honor, to the

10   question.  I -- the characterization of that they were

11   driving to shoot Mr. Livigni.  I believe the testimony is

12   they were to do something, and the shooting just happened.

13        THE COURT:  Sustained.

14        Rephrase the question.

15   BY MR. TREZEVANT:

16   Q    Prior to going to the Port O' Call, did you pick up any

17   weapons?

18   A    As I said, yes, we did, at Joe O'Kane's home.

19   Q    And when you went to the Port O' Call, what was your

20   purpose in going there, sir?

21   A    To give backup to John Alite.

22   Q    While John Alite did what?

23   A    I can't use his mindset, but whatever --

24        MR. COROZZO:  Objection, then, Your Honor.  He

25   doesn't know.

24

1    BY MR. TREZEVANT:

2    Q    What was your understanding of what you all were going

3    to the Port O' Call to do?

4    A    Put harm to Michael Livigni.

5    Q    And when you arrived at the Port O' Call, who were you

6    with, sir?

7    A    Joseph Stabile.

8    Q    Were you in a car?

9    A    I was in a car with Joseph Stabile.

10   Q    Who was driving the car?

11   A    Joseph Stabile.

12   Q    Whose car was it?

13   A    One of the cars Joseph O'Kane had.

14   Q    Where was Mr. Alite?

15   A    In the car with Joseph O'Kane.

16   Q    And who was driving that car, sir, if you know?

17   A    Don't know.

18   Q    Do you know what kind of car it was?

19   A    Corvette.

20   Q    Did Joseph O'Kane own a Corvette at that time, sir?

21   A    That car -- I didn't say it was that car.  It was not

22   Joseph O'Kane's car.

23   Q    Whose car was it, sir?

24   A    John Alite's.

25   Q    When the two cars approached the Port O' Call, where

1    did they park?

2    A    Cars parked on Atlantic Avenue right here.

3    Q    What -- what is located there to allow the cars to

4    park?

5    A    It's a bus stop.

6    Q    Was one car located in front of the other?

7         I mean, how did they park?

8    A    Alite and O'Kane pulled up in front, myself and Stabile

9    behind.

10   Q    After, uh, the shooting, did the four of you go --

11   leave together?

12        How did that happen?

13   A    Same thing.  Two guys in each car.

14   Q    Both individuals in the same car as when they arrived?

15   A    As we arrived, correct.

16   Q    And where did you go?

17   A    O'Kane and Alite went towards Alite's mother's house.

18   Myself and Stabile went to Stabile's mother's house.

19   Q    Following the shooting of Mr. Livigni, did anyone hide,

20   leave town, any of that kind of thing?

21   A    What I'd known is John Alite went to the --

22   Pennsylvania, Poconos, for a day or so.

23   Q    Did you leave town?

24   A    No, I did not.

25   Q    Were you worried about getting caught?

1   A     No.  I should have, but I wasn't.

2   Q     How soon after the shooting of Mr. Livigni did you

3   return to the P.M. Pub?

4   A     Next day.

5   Q     When you returned to the P.M. Pub the next day, did you

6   see Mr. Trucchio there?

7   A     Mr. Trucchio was there, yes.

8   Q     And did you have any conversation within the P.M. Pub

9   with Mr. Trucchio on that day?

10  A     There was a brief conversation that he was satisfied

11  and happy with what was going on.  Some people were worried

12  about if there was going to be any repercussions.

13  Q     Now, when you say "a brief conversation," about what,

14  sir?

15  A     About satisfied that -- what was done, you know.  He

16  was -- more satisfied that John Alite would do something

17  like that for him and, you know, that's what was supposed to

18  be done.  That's your boy, that's your partner.

19        Alite and Ronnie are best of friends and, you know,

20  Alite stepped up and took care of what had to be taken care

21  of.  And us being friends of his and being there, whatever

22  we could do, you know, satisfied job.

23  Q     All right, sir.

24        Now, if we could move to another area.  Were you ever

25  personally in the presence of a large quantity of cocaine or

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                            Case No. 8:04-CR-348-T-24TGW
-vs-                        23 October 2006
                            Tampa, Florida
                            9:30 a.m.

RONALD J. TRUCCHIO
 a/k/a RONNIE ONE ARM
STEVEN CATALANO
KEVIN M. McMAHON
TERRY L. SCAGLIONE,
          Defendants.
-------------------------------/

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:        DENNIS MOORE, ESQUIRE
                        JAY G. TREZEVANT, ESQUIRE
                        Assistant United States Attorneys
                        United States Attorney's Office
                        400 North Tampa Street, Suite 3200
                        Tampa, Florida 33602
                        (813) 274-6000

For the Defendant
 Ronald Trucchio:        GEORGE J. VILA, ESQUIRE
                        Law Office of George
                         J. Vila
                        1221 Brickell Avenue
                        Suite 1020
                        Miami, Florida 33131
                        (305) 373-5707

For the Defendant
 Steven Catalano:        THOMAS OSTRANDER, ESQUIRE
                        Law Office of
                         Thomas H. Ostrander, P.A.
                       516 10th Street West

PAUL K. SPANGLER, RPR, RMR, CRR
OFFICIAL UNITED STATES COURT REPORTER

28

1          THE COURT:  Mr. Brunvand, any questions?

2          MR. BRUNVAND:  No, thank you, Your Honor.

3          THE COURT:  All right.  Any redirect,

4    Mr. Trezevant?

5                    REDIRECT EXAMINATION

6    BY MR. TREZEVANT:

7    Q    Yes, Your Honor.

8         Mr. Ciaccio, when Mr. Trucchio asked you a little while

9    ago about, uh, earlier testimony wherein you testified that

10   in the eighties you were with Ronnie Trucchio, do you recall

11   that question, sir?

12   A    I recall that question.

13   Q    And could you explain to this jury what that means,

14   being with someone when you use a phrase like that.

15   A    Back in the eighties, even to today, when you're doing

16   certain criminal activities, I explained to the jury last

17   time -- and this is the criminal activity life -- and at the

18   times it was a whole bunch of associates were associating,

19   and Ronald Trucchio was involved with certain people who

20   were higher up, who the people in the neighborhood knew he

21   was involved with.

22        My association came to Ronald Trucchio through

23   John Alite.  And at that time John Alite and Ron Trucchio

24   were hand-in-hand like partners in the criminal activities

25   that I was involved in.

1   Q   And so, the phrase, "being with someone," does that

2   have a certain significance in that world of crime?

3   A   It could help, yes, it could.  It could help very much.

4   Q   Could you explain to the jury what it means to be

5   "with" a person.

6   A   Well, Ron Trucchio at the time was associated with --

7           MR. TRUCCHIO:  Objection, Your Honor.  Going

8   outside the scope.

9           THE COURT:  Sustained.

10          He's just asking you what it means to be with

11  somebody.

12          THE WITNESS:  I'm sorry.  I was trying to explain

13  to the jury that Ron Trucchio was with certain people who

14  were important in our neighborhood.

15  BY MR. TREZEVANT:

16  Q   And in that -- in that -- in that sphere of criminal

17  activity, if you say you're with Ronald Trucchio, what does

18  that mean?

19  A   It means --

20          MR. TRUCCHIO:  Objection, speculation, Your Honor.

21          THE COURT:  Overruled.

22          What does it mean to you?

23          THE WITNESS:  As again, what it meant to myself

24  and it meant to the people who I was associated with, if

25  they were with Ronald Trucchio or the people who were

1    involved with him, if they have a problem, Ronald Trucchio

2    could have a problem.  And if Ronald Trucchio has a problem

3    because of his position, the people he was involved with

4    would have a problem.

5    BY MR. TREZEVANT:

6    Q    And you were with Ronald Trucchio for what year, sir?

7    A    '86, '87 and '88.

8    Q    Is that when you were in the crew headed by

9    Mr. Trucchio and Mr. Alite?

10   A    Exactly.  Headed by Mr. Ronald Trucchio and

11   Mr. John Alite.

12   Q    Now, sir, do you recall on Friday, when Mr. Corozzo

13   asked you a number of questions about your involvement as

14   a crew member in -- actually in the sale of cocaine?

15   A    Yes, I do.

16   Q    And, uh, did you name a number of bars in which you

17   delivered cocaine to a person who was selling cocaine in the

18   bar?

19   A    Yes, I do.

20   Q    Did you say during -- at that time that the cocaine

21   typically came to you from Mr. Joseph O'Kane?

22   A    Through Mr. Joseph O'Kane and Mr. John Alite.

23   Q    After you would deliver the cocaine to a person, I

24   believe you said Mr. Robert Angle in the bar, who actually

25   would receive payment for the cocaine?

31

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                 Case No. 8:04-CR-348-T-24TGW
-vs-                              1 November 2006
                                 Tampa, Florida
RONALD J. TRUCCHIO              9:30 a.m.
 a/k/a RONNIE ONE ARM
STEVEN CATALANO
KEVIN M. McMAHON
TERRY L. SCAGLIONE,
       Defendants.
------------------------------/

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:        DENNIS MOORE, ESQUIRE
                        JAY G. TREZEVANT, ESQUIRE
                        Assistant United States Attorneys
                        United States Attorney's Office
                        400 North Tampa Street, Suite 3200
                        Tampa, Florida 33602
                        (813) 274-6000

For the Defendant
 Ronald Trucchio:        JOSEPH R. COROZZO, ESQUIRE
                        Rubinstein & Corozzo, PC
                        260 Madison Avenue
                        New York, New York 10016
                        (212) 545-8782

For the Defendant
 Steven Catalano:        THOMAS OSTRANDER, ESQUIRE
                        Law Office of
                         Thomas H. Ostrander, P.A.
                        516 10th Street West
                        Bradenton, Florida 34205
                        (941) 746-7220

PAUL K. SPANGLER, RPR, RMR, CRR
OFFICIAL UNITED STATES COURT REPORTER

Page 113

1  Q     About John Alite?

2  A     Yeah.

3  Q     That's what Mr. Scaglione told Mr. Alite?

4  A     That's what Alite told me, yes.

5  Q     Were you involved in a robbery of a funeral home in

6  Queens, New York?

7  A     No.

8  Q     Were you involved in discussions of a robbery of a

9  funeral home in Queens, New York?

10  A     Yes.

11  Q     What was the name of the funeral home?

12  A     Papavero.

13  Q     Papavero?

14  A     Yes.

15  Q     And, uh, was the Papavero Funeral Home -- strike that.

16        Where was the Papavero Funeral Home located?

17  A     Maspeth, Queens.

18  Q     Maspeth?

19  A     Yeah.

20  Q     And, uh, where is Maspeth, Queens?

21  A     From where I live, or --

22  Q     Is it located near Woodhaven or --

23  A     Yeah, ten minutes.

24  Q     Okay.

25        Uh, and, uh, you -- when you say you were involved in

1    discussions of the -- of robbing the Papavero Funeral Home,

2    can you recall the month and year of those discussions?

3    A    (Shaking head negatively)  No, I'm not sure.

4    Q    Was it before Mr. Alite went to prison in 1996?

5    A    Yes.

6    Q    Okay.

7         Uh, with whom did you discuss the robbery of the

8    Papavero Funeral Home?

9    A    Patsy and John Alite.

10   Q    Tell us about that discussion.

11        What was discussed on that occasion?

12   A    John asked me if I knew where it was, and said that he

13   had some information that there was a lot of money there.

14   Q    You have to speak up now.

15   A    John asked me if I knew where it was, and he said there

16   was a lot of money supposed to be in there.

17   Q    Okay.

18        And, uh -- okay, well, why was that important that

19   there was supposed to be lot of money in there?

20   A    Because he wanted to rob it.

21   Q    Okay.

22        Did he ask you to rob the funeral home?

23   A    Yes.

24   Q    Okay.

25        And was this while you were in the presence of -- well,

34

1    who was present when he asked you that?

2    A    I think it was just me, John and Patsy.

3    Q    Okay.

4         And were you aware at the time this conversation took

5    place, did you know about the Papavero Funeral Home?

6    A    Yes.

7    Q    Did you know where it was located?

8    A    Yes.

9    Q    How did you know about the Papavero Funeral Home?

10   A    My grandmother lived down the block from it.

11   Q    Okay.

12        Did anybody in your family know the owners of the

13   Papavero Funeral Home?

14   A    Yes.

15   Q    Who -- who knew the owners of the Papavero Funeral

16   Home?

17   A    My father and my grandmother -- my whole family.

18   Q    Including yourself?

19   A    Yeah.

20   Q    Okay.

21        And when Mr. Alite, uh, was discussing the robbery of

22   the Papavero Funeral Home, did you agree to help rob that or

23   not -- that home, or not?

24   A    No.

25   Q    And tell us about that.  What did you say about that?

(35)

Page 116

1   A   I said that my family knows them.  And he said then you

2   can't be involved, because just in case they see me.

3   Q   Okay.

4       And so, were you involved in the robbery of the

5   Papavero Funeral Home?

6   A   No.

7   Q   Do you know whether or not the Papavero Funeral Home

8   was ever robbed?

9           MR. COROZZO:  Objection, Your Honor, foundation.

10          THE COURT:  Sustained.

11  BY MR. MOORE:

12  Q   Did you ever have any discussion with Mr. Alite and

13  Mr. Andriano as to whether or not the Papavero Funeral Home

14  was robbed?

15  A   Yes.

16  Q   And, uh, what did Mr. Alite tell you in that regard?

17  A   That they went to rob it, but it got messed up.

18  Q   When you say "they went to rob it," who did Mr. Alite

19  say went to rob it?

20  A   John Alite, Kevin McMahon, Charles Carniglia, uh,

21  Pasquale Andriano, Dave D'Arpino and, uh, Ray Assante.

22  Q   Okay.

23      Uh, did you have conversations with Mr. Andriano about

24  whether or not the funeral home had been robbed?

25  A   Yes.

1   Q    What did he tell you?

2   A    Same thing.  They tried to rob it, but they didn't get

3   what they were supposed to get.

4   Q    Okay.

5        Now, you mentioned, uh, some names that -- that they

6   mentioned.  Uh, you mentioned Dave D'Arpino?

7   A    Hum-hum.  (Nodding affirmatively)

8   Q    Was he involved?

9   A    Yes.

10  Q    Uh, Patsy?

11  A    Yes.

12  Q    Charles Carniglia?

13  A    Yes.

14  Q    Did you -- did you know Charles Carniglia?

15  A    Yes.

16  Q    How did you know Charles Carniglia?

17  A    Met him through John Alite.

18  Q    And, uh, where did -- where were you introduced to

19  Charles Carniglia?

20  A    I don't remember where.

21        MR. COROZZO:  Excuse me.  I could not hear that

22  answer.

23        THE WITNESS:  I don't remember where.

24  BY MR. MOORE:

25  Q    Did you, uh -- are you familiar with an individual by

37

1    the name of John Carniglia?

2    A    Yes.

3    Q    And, uh, is John Carniglia related in any way to

4    Charles Carniglia?

5    A    His brother.

6    Q    And was Mr. Charles Carniglia and Mr. John Carniglia,

7    were they, uh, wise guys?

8    A    Yes.

9    Q    And, uh, whose crime family were they in?

10   A    Gambino.

11   Q    The Gambino crime family.

12        Uh, had you -- had you ever, uh, seen Kevin McMahon in

13   the presence of Charles Carniglia, or John Carniglia?

14   A    Uh, Charles, I seen him with -- not John.

15   Q    Okay.

16        And on more than one occasion?

17   A    Yes.

18   Q    How many times have you seen Kevin McMahon with

19   Charles Carniglia?

20   A    A lot, pretty much every time I seen him.

21   Q    Okay.

22        And where would you see Mr. McMahon and

23   Charlie Carniglia?

24   A    Around the neighborhood.

25   Q    Now, did Patsy and John Alite tell you that

38

1    Charles Carnig --

2              MR. COROZZO:  Objection to the leading,

3    Your Honor.

4              THE COURT:  Sustained.

5    BY MR. MOORE:

6    Q    Okay.

7         What did Mr. Alite tell you, uh -- well, let me -- what

8    did Mr. Alite tell you as to who went inside the funeral

9    home?

10   A    Uh, Kevin McMahon and Ray Assante.

11   Q    Who is Ray Assante?

12   A    A guy from the neighborhood.

13   Q    Okay.

14        Did you know Mr. Assante?

15   A    I met him before.

16   Q    Okay.

17        Did you hang around much with him?

18   A    No.

19   Q    Was he a Woodhaven guy, or a Howard Beach guy, or an

20   Ozone Park guy?

21   A    I met him when he was working with --

22              MR. COROZZO:  Objection to the form of the

23   question, Your Honor.

24              THE COURT:  Sustained.

25              Rephrase.

39

Page 120

1   BY MR. MOORE:

2   Q   If you know, what neighborhood did he hang out in?

3   A   When I met him he was in Woodhaven.  I don't know where

4   he lives.

5   Q   And, uh, what did Mr. Alite tell you about what

6   happened at this robbery of the Papavero Funeral Home?

7   A   Just said that Kevin and Ray went to get the money, and

8   they didn't get what they were supposed to get.

9   Q   Okay.

10      What did Mr. Andriano tell you about the robbery of the

11  funeral home?

12  A   Same thing.

13  Q   Okay.

14      And, uh, did they say whether or not they got any money

15  from the funeral home?

16  A   Couple of thousand, I think.

17  Q   Okay.

18      And, uh, did you get any money from the funeral home

19  robbery?

20  A   No.  (Shaking head negatively)

21  Q   Did they tell you how much they thought they were going

22  to be getting from the robbery?

23  A   Half-a-million or more.

24      (Pause.)

25  Q   Have you ever been to an establishment known as

40

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                            Case No. 8:04-CR-348-T-24TGW
-vs-                         8 November 2006
                            Tampa, Florida
                            9:30 a.m.
RONALD J. TRUCCHIO
 a/k/a RONNIE ONE ARM
STEVEN CATALANO
KEVIN M. McMAHON
TERRY L. SCAGLIONE,
        Defendants.
-------------------------------/

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:        DENNIS MOORE, ESQUIRE
                             JAY G. TREZEVANT, ESQUIRE
                             Assistant United States Attorneys
                             United States Attorney's Office
                             400 North Tampa Street, Suite 3200
                             Tampa, Florida 33602
                             (813) 274-6000

For the Defendant
 Ronald Trucchio:       JOSEPH R. COROZZO, ESQUIRE
                             Rubinstein & Corozzo, PC
                             260 Madison Avenue
                             New York, New York 10016
                             (212) 545-8782
                             GEORGE J. VILA, ESQUIRE
                             Law Office of George
                              J. Vila
                             1221 Brickell Avenue
                             Suite 1020
                             Miami, Florida 33131
                             (305) 373-5707

PAUL K. SPANGLER, RPR, RMR, CRR
OFFICIAL UNITED STATES COURT REPORTER

41

Page 62

1    with a weapon?

2    A     No, not all of them, no.

3    Q     Of the ten, approximately how many were you armed with

4    a weapon?

5    A     Maybe four or five of them.

6    Q     And what type of weapon did you have during those

7    robberies, sir?

8    A     It was a pistol.

9    Q     Approximately when did the robberies occur?

10   A     In '98, a couple of months in '98, spring of '98.

11   Q     Did you commit these robberies with anyone else, or on

12   your own?

13   A     No, I was by myself.

14   Q     Was it part of any larger group or crew, or was it just

15   individual crimes?

16   A     It was just individual crimes.

17   Q     And the period during which you committed these armed

18   robberies, is that a period during which, uh -- well, let me

19   back up.

20         Do you know John Alite, sir?

21   A     Yes.

22   Q     When did you first meet John Alite?

23   A     When I first moved into Woodhaven, 1976.

24   Q     So, the period during which you were committing these

25   robberies by yourself down here in Florida in 1998, was

Page 69

1    A    That they will go down and let it be known that I

2   helped them in their case and I cooperated truthfully.

3    Q    And, uh, was your family relocated, sir?

4    A    Yes.

5    Q    On how many occasions?

6    A    Twice.

7    Q    And, uh, were -- was your family provided with any

8   expenses associated with that relocation?

9    A    Yes.

10   Q    Approximately how much money was your family provided

11  relative to those two relocations?

12   A    I believe up to now it's $27,000.

13   Q    All right, sir.

14       Now, other than your crime here in Florida, I'd like to

15  go back and focus a little bit on your growing up in Queens,

16  in New York.

17       How old were you, if you can tell us, when you first

18  became involved in criminal activity up in New York?

19   A    I was 11, 12 years old.  We were doing -- you know,

20  getting into trouble already.

21   Q    And if you need some water, Mr. Bonner, there's a

22  little jug there and a cup.

23       (Pause.)

24   A    Okay.

25   Q    Initially what type of criminal activity were you doing

43

Page 170

1   He didn't say yes, he didn't tell him no either.  He just

2   sort of said he would get back to him and let him know, and

3   never got back to him.

4   Q    Now, sir, do you know whether Patsy DiPippa engaged in

5   criminal activity with John Alite?

6   A    I know from Johnny, that Johnny Alite told me, yes,

7   that he was doing things with him.

8   Q    Did you ever engage in criminal activity with

9   Patsy DiPippa and John Alite together?

10  A    Yes.

11  Q    When was, uh -- when did you engage in criminal a act

12  with John Alite and Patsy DiPippa?

13  A    Oh, Johnny was holding a grudge against, uh -- against

14  Joe O'Kane for a couple of years --

15  Q    And approximately what year are we talking about now,

16  sir?

17  A    This is early '94, maybe.  Yeah, March of '94 it was.

18  But all through the years he held -- was holding a little

19  bit of a grudge against him because of the situation with

20  the money.

21  Q    Did you all discuss that grudge?

22  A    Yes.

23  Q    And did you ever make any suggestion to Mr. Alite, uh,

24  as to what could be done with Joe O'Kane?

25  A    I suggested that we rob him.

Page 171

1   Q    At the time you made the suggestion, was it accepted?

2   A    Not right away, no, unh-unh.  (Shaking head negatively)

3        No, he -- he didn't -- John sort of rounded out on me

4   about it.  He didn't give me no definitive answer, you know.

5   I was a little angry with Joe also because his situation, he

6   was getting married to my brother's ex-girlfriend, so there

7   was a little beef there with me and him.

8        Uh, no, one night in the middle of the night in early

9   '94 he called me up -- Johnny Alite called me up, and he

10  said, we're going to rob Joe.

11  Q    Now, when John Alite said "we're going to rob Joe," uh,

12  what did you take that to mean, sir?

13  A    I mean, I took it to mean we were going to rob

14  Joe O'Kane.

15  Q    And did, in fact, you participate in a robbery of

16  Joe O'Kane?

17  A    Yes.

18  Q    How soon after the phone call in '94 did you

19  participate in the robbery of Joe O'Kane?

20  A    It was a couple of weeks after that.

21  Q    And where were you living at the time you received the

22  phone call?

23  A    I was down in, uh, Coral Springs, Florida.

24  Q    And where was John Alite living?

25  A    He was in New Jersey.

(45)

Page 172

1  Q    When he called you and said he was going to -- that we

2  were going to rob Joe O'Kane, did that cause you any

3  concern?

4  A    A little bit.  I, uh --

5  Q    And why is that, sir?

6  A    Joe O'Kane was -- he was making a lot of money.

7        MR. COROZZO:  Objection to the foundation,

8  Your Honor.

9        THE COURT:  Sustained.

10       MR. COROZZO:  Move to strike, Your Honor.

11       THE COURT:  Ask the jury to disregard it.

12       You need to ask him how he knows that.

13  BY MR. TREZEVANT:

14  Q    Sir, did you have an understanding of -- as to what

15  Mr. O'Kane was doing at the time?

16  A    Yes.  He was selling --

17  Q    Wait, wait.

18       And based on your understanding of what Mr. O'Kane was

19  engaged in, were you concerned about whether you could rob

20  him?

21  A    Yes.

22  Q    Could you explain that to the jury.

23  A    He's selling coke, and he has to be paying somebody.  I

24  know he's not paying John because John wants to rob him.

25  But he has to be paying somebody.  He has to be connected to

Page 173

1   somebody.

2       So, my concern was if we robbed him, what would happen,

3   what would the repercussions be?

4   Q    And would the repercussions be from Joe O'Kane, or

5   whoever he was with?

6   A    Probably from whoever he was with.

7   Q    And was that your concern?

8   A    Yes.  I wasn't really concerned about Joe, I was

9   concerned about whoever he was with.

10  Q    And did you raise this issue to John?

11  A    Yes.

12  Q    And what, if anything, did Mr. Alite tell you when you

13  raised this up?

14  A    I asked John if, uh -- if this was okayed.

15  Q    And what, if anything, did he tell you?

16  A    He said yes.

17  Q    Did he -- did you ask him what would occur if anyone --

18  if there were repercussions?

19  A    He said we didn't -- for this, he said we didn't have

20  to worry about it.

21  Q    Did he tell you why?

22  A    He said that Ronnie would have our back.

23  Q    And when he said Ronnie had your back, what did you

24  take that to mean?

25  A    That, uh, Ronald Trucchio okayed it.

47

Page 199

1   A   No.

2   Q   Was it your business?

3   A   No.

4   Q   Now, after that, sir, what, if anything, did you do?

5   A   Uh, we took the kids home.  I think the kids were

6   there.  We took the kids back to, uh -- I dropped my kid off

7   at my mother's house, he went to Claudia's house, and we

8   went back to the club, and we had a drink at the bar over

9   there with Ronnie.

10  Q   When you say you went back to the club, what club, sir?

11  A   The club on 77th Street, across from Aldo's.

12  Q   And, uh, did you go to a bar near the club, sir?

13  A   The bar on the corner, yeah.

14  Q   And who went in?

15  A   Me, Johnny and Ronnie.

16  Q   And do you have a drink?

17  A   Yes.

18  Q   And then what, if anything, happened?

19  A   Then I went home.  (3:00 p.m.)

20  Q   Now, uh, did you ever have any conversations with

21  Mr. Alite about who he was with during this period?

22  A   Yeah.  Yeah, we -- yeah, we had conversations.

23  Q   And who did he tell you he was with?

24  A   He told me that he was -- he didn't say that he was

25  with Ronnie.  He didn't -- you don't -- it's -- it's not

1   spoken like that.

2       But every time there was a problem or a reference, he

3   would mention Ronnie's name.  You know, I'll go see Ronnie,

4   or what -- you know?  There's only one thing that means, and

5   that's that he's with Ronnie.  That's it.

6       It's not like he said, oh, I'm with Ronnie, you know.

7   It's not spoken like that.  It's not spoken in that manner.

8   Q    So when he would say, "I'll go see Ronnie," who did you

9   take that to mean, sir?

10  A    To mean Ronnie Trucchio.

11  Q    Now, sir, did you ever have any discussions around this

12  time period, uh, when you were in, uh, New York with

13  Mr. Alite about whether Ronnie, uh -- Ron Trucchio was, uh,

14  a part of any organized crime family?

15  A    When -- when I first went down to Florida he was coming

16  down --

17  Q    Who's "he," sir?

18  A    John Alite was coming down, and we'd go out to eat, and

19  he would tell me what was going on up there.

20  Q    Would he keep you apprised of --

21  A    Yeah, he'd -- just what was happening in the

22  neighborhood.  And he told me that, uh -- he said that,

23  uh -- he told me when Junior got made, Carmine Agnello got

24  made, he said Ronnie got made.  He mentioned all the things

25  that were going on in the neighborhood.

49

1   gotten information that we left money behind.

2   Q   Who had gotten that information, sir?

3   A   Johnny Alite and Steve Catalano.

4   Q   And when were you told that?

5   A   As soon as they got to the house.

6   Q   How much did they tell you was missed?

7   A   It was about 150,000, I think.

8   Q   After, uh, you got your $5,000, where did you go?

9   A   I went to Kennedy Airport and went home.

10   Q   How did you get to Kennedy Airport, sir?

11   A   How did I get there?

12   Q   Yes.

13   A   Uh, Patsy drove me.

14   Q   And who drove with you and Patsy, if anyone?

15   A   It was me, Mike Malone and Patsy.

16   Q   All right, sir.

17       And you flew back home?

18   A   Yes.

19   Q   And later during the fall of 1995 did you again have

20   occasion to travel to the northeast and engage in criminal

21   activity?

22   A   Yes.  Uh, John had called me up and he told me that

23   they have, uh -- he had another job to do.

24   Q   Did he tell you what the job was going to be?

25   A   Yeah.  He said it was a funeral home.

50

Page 256

1   Q    And did he tell you why you all were going to rob a

2   funeral home?

3   A    The -- the family who owned the funeral home or ran the

4   funeral, the sons, were -- they were -- they were drug

5   dealers.  They were traffickers, he said.

6   Q    Did you know this, sir, or was that what Mr. Alite told

7   you?

8   A    That's just what Alite told me -- Johnny Alite told me.

9   Q    Now, where was the funeral home located?

10  A    The funeral home was in Maspeth.

11  Q    Is Maspeth in New York City, sir?

12  A    Yes, it's in New York City.  It's in the neighborhood

13  in Queens.

14  Q    And at some point did you travel to Queens to rob the

15  funeral parlor?

16  A    Yes.

17  Q    The, uh -- prior to robbing the funeral parlor, did you

18  have any discussions with Mr. Alite as to whether the

19  funeral parlor was protected in any way?

20  A    Well, the guys are drug dealers in the place, so, uh,

21  he -- I says, well, they must be with somebody.

22       He says, yeah, they're connected, I believe, to guys on

23  101st Avenue, he said.

24  Q    Did that cause you concern?

25  A    Yes -- yeah.

51

1    Q    Why is that?

2    A    Because again, I don't want to get stuck in the middle

3    of something that -- that, uh, you know, that something -- I

4    don't want to be a guy left out hanging, you know.  So, I

5    wanted to make sure that it was authorized that -- what we

6    were doing.

7    Q    And what did Johnny Alite tell you, sir?

8    A    He said it was.  He said if anything ever came out and

9    it got too hot, that Ronnie would step in and take care of

10   it for us.

11   Q    And when he said "Ronnie," who did you take that to

12   mean, sir?

13   A    Ron Trucchio.

14   Q    Now, uh, did you travel to Queens?

15   A    Yes.

16   Q    How did you get there?

17   A    I, uh -- I took a plane to, uh -- again, to Newark

18   Airport.

19   Q    Do you remember what airlines?

20   A    I think it was Carnival.

21   Q    And when you arrived in Newark, uh, were you met by

22   anyone?

23   A    Yeah, Johnny Alite picked me up, uh, at the airport

24   with some kid, a young kid.

25   Q    Did you know the kid?

52

1   A    No, not -- no.

2   Q    And after he picked you up, where did you all go?

3   A    We went to a strip joint in New Jersey.  Uh --

4   Q    Why did you go there, sir?

5   A    The information that Johnny was receiving from this

6   funeral home was coming out of that strip joint.  I think

7   one of the strippers was messing with one of the sons, or

8   something like that -- it had -- there was some connection

9   there.  I wasn't -- you know, I didn't really ask too many

10  questions about it.

11  Q    Is that how it was explained to you, sir?

12  A    Yes.

13  Q    By who?

14  A    By Johnny Alite.

15  Q    And, uh, after going to this -- the strip club, where

16  did you all go?

17  A    Then we went to, uh, Chelsea's Steakhouse.  We drove

18  into Queens, New York.

19  Q    And at -- the dinner at Chelsea's Steakhouse, who was

20  there, sir?

21  A    It was me, Johnny Alite -- Kevin McMahon was already

22  there -- the kid that had drove Johnny out to the airport to

23  pick me up, he was with us.  There was a couple of other

24  guys that I really didn't know that were there.  It was late

25  by then.  It was about maybe 1:00 o'clock in the morning by

1    then.

2    Q    Did you eat dinner?

3    A    Yeah, we had shrimps and stuff like that.

4    Q    And, uh, after dinner where did you all go?

5    A    After that we went to -- we went to Claudia's mother's

6    house in Howard Beach, and we stayed there for the night.

7    Q    The following morning, what, if anything, did you do?

8    A    The following morning we met up with Kevin McMahon, and

9    we drove up to the -- to the funeral home.

10   Q    When you drove to the funeral home, what was the point

11   of going up on that morning?

12   A    Well, we just wanted to get a -- you know, you just

13   want to inspect the place and see -- see what's going on up

14   there.  We, uh -- we stayed up there for a couple of hours

15   watching the place.

16        Kevin McMahon actually went into the place, talked to

17   the guy and said that, uh, somebody in his family had passed

18   away.  And the guy said to come back the next day, Sunday.

19   Q    Was that the plan, sir?

20   A    Yes.

21   Q    Now, when you were watching the place and Kevin McMahon

22   was there, who else was there?

23   A    It was me, Johnny Alite and Kevin McMahon.

24   Q    Did anyone have any sort of electronic equipment at the

25   location?

Page 260

1    A    Kevin McMahon had a -- he had some walkie -- he had

2    some electronic gadgets, I don't know.  He -- they were --

3    he had something.  He had -- I don't know.  He had some --

4           MR. BRUNVAND:  Objection, speculation.

5           THE COURT:  Sustained.

6           If you know, you can answer.  If you don't know,

7    say you don't know.  If you want to just describe what it

8    was without telling us, that's fine too.

9           THE WITNESS:  Well, whatever he had, we were

10   driving, uh, and the guy next to us on the phone, we was

11   able to hear his conversation a little bit, you know.  I

12   don't know exactly what it was, but that's -- you know.

13   BY MR. TREZEVANT:

14   Q    Some sort of a receiver?

15   A    Yes, it was something like that.

16   Q    Now, Ms. Lanier is going to approach and hand you

17   Government's 18A1 and 18A2.

18        (Pause)

19        Take a moment and look at these two exhibits, sir.

20        (Pause.)

21        Have you had a look at them?

22   A    Yes.

23   Q    Do you recognize the exhibits?

24   A    Yeah, this is --

25   Q    Well, before we go into it, sir --

1   A    Yeah.

2   Q    -- are they photographs?

3   A    They're aerial photos.

4   Q    Aerial photos.

5        Do you recognize the area depicted in the photographs?

6   A    Yeah, I know it's -- it's Grand Avenue, yeah.

7   Q    And does it, uh, have anything to do with the robbery

8   of the funeral parlor, sir?

9   A    It looks like the funeral parlor is right on the corner

10  there.

11  Q    Is it a fair and accurate depiction of the area?

12  A    Yes.

13        MR. TREZEVANT:  Your Honor, we'd offer 18A1 and

14  18A2.

15        THE COURT:  Any objections?

16        Receive into evidence 18A1 and 18A2.

17        (Thereupon, Government's Exhibits 18A1 and 18A2

18  were received and filed in evidence.)

19  BY MR. TREZEVANT:

20  Q    If you could, Mr. Bonner, could you tell us where,

21  uh -- you said Grand Avenue.  Where is Grand Avenue located

22  on this aerial photograph?

23  A    It's this big -- right there.  That big main street

24  right there.

25  Q    You can actually reach out and touch the screen and

1    drag your finger along Grand Avenue.

2    A    That's it right there.

3    Q    And where is the funeral parlor, sir?

4    A    (Indicating)

5    Q    Now, on the Saturday when you and Mr. Alite and

6    Mr. McMahon went and watched the funeral parlor, where did

7    you stay?

8         Where did you park the car?

9    A    We parked right up, uh -- right up the block from the

10   funeral parlor, about there.

11   Q    And did you stay in the car?

12   A    No.  We, uh -- for a little while we stayed in the car.

13   Then we went to -- we went to get something to eat on

14   Grand Avenue.  And that was when Kevin went inside the

15   place.

16   Q    Now, on the day of the robbery, sir, how soon after the

17   Saturday that you watched the funeral parlor did the robbery

18   occur?

19   A    It occurred the next day.

20   Q    On the day of the robbery, sir, what was the plan?

21   A    Well, Kevin went in there --

22   Q    And when you say "Kevin" --

23   A    Kevin McMahon, excuse me.  He went in there, and he

24   spoke to the guy, he said someone in his family passed away.

25   And the guy told him come to back the next day.

57

1       We were going to go there.  It was a Sunday, so the

2   place was closed.  We were going to go there, walk in and

3   say my cousin or so and so was here yesterday, uh, talking

4   about buying a coffin.

5       We were going to go down into the -- into his little

6   exhibit there, and then we were going to -- and then we were

7   going to pull a gun on him and rob him.

8       Supposedly the, uh -- the information we got was that

9   there was a safe behind one of the pictures in the office

10  downstairs.

11  Q    And did anybody provide you information as to what the

12  interior of the funeral parlor looked like before you went?

13  A    Uh, johnny Alite told me a little bit about what was

14  down there, but he didn't get too -- he didn't get too

15  specific about it.

16  Q    And were you going to be the person going into the

17  funeral parlor?

18  A    Yes.

19  Q    Who were you going to be going into the funeral parlor

20  with?

21  A    I was supposed to go in there with Steve Catalano, but

22  for some reason he couldn't make it up there.  So -- and

23  they got some other guy to go in there.

24  Q    Did you know the guy?

25  A    Not really, no.

1   Q    And --

2   A    I'm not too sure.

3   Q    On the morning of the robbery, sir, how many cars, uh,

4   went to the funeral parlor?

5   A    There was two carloads.

6   Q    Who was in your car, sir?

7   A    It was me, Johnny Alite, the guy who -- who he got to

8   come in, and, uh, there was somebody else driving.  Also,

9   Patsy Andriano was there.  He had another car.  There was --

10  there was about six guys -- five or six guys.

11  Q    In we could look at 18A2.

12       Is this a closer aerial photograph, sir?

13  A    Yes.

14  Q    And on the morning of the robbery, uh, where did the

15  car let you out?

16  A    Right there.

17  Q    Now, in your car you said was Mr. Alite?

18  A    Yes.

19  Q    And the other person?

20  A    Yeah, but he -- he had gotten out.  I had gotten into

21  the car that, uh -- that Patsy was driving.  Patsy dropped

22  me off over there.

23  Q    All right.

24       If we could back up a little bit.  You said Mr. Alite

25  had gotten out of the car?

1   A     Yeah.  Well, I had -- we had switched cars.  We had

2   switched cars.  I had went into the car that Patsy was

3   driving.

4   Q     And where did Mr. Alite go?

5   A     Mr. Alite stayed in the car that he was driving in.  I

6   had went into Patsy -- the car that Patsy was driving.

7   Q     And, uh, who was going to go in with you, sir?

8   A     Originally it was supposed to be Steve Catalano.  But

9   he couldn't make it, so John had to get somebody.  He got

10  somebody from the neighborhood.

11  Q     And when you got into the car with Patsy Andriano, who

12  was in that car?

13  A     It was me, Patsy, the guy who I didn't -- who I was

14  doing the robbery with, and, uh, there was -- there might

15  have been somebody else in the car, or Patsy, I'm not -- I'm

16  not sure.

17  Q     Now, was Mr. McMahon present?

18  A     No, I didn't see him present in the car, no.

19  Q     And what was his role, if any, in the --

20  A     He was --

21  Q     -- actual robbery?

22  A     He provided the walkie-talkies for the -- for the

23  robbery.

24  Q     And did you carry a walkie-talkie?

25  A     Yes.  I had a walkie-talkie, and he had a

60

1   walkie-talkie.

2   Q    Who's "he," sir?

3   A    Kevin McMahon.

4   Q    So, was he present at the scene of the robbery?

5   A    Yeah, he was on the scene of the robbery, but he was in

6   Johnny Alite's -- the car Johnny Alite was driving in.

7   Q    All right.

8        And was anybody going to give you a signal as to when

9   to go in?

10  A    Johnny Alite was supposed to -- no, when we got there,

11  Johnny Alite was already there.  There was a -- there's a

12  triangle over there.  He was like right over here.  There

13  used to be a phone over there.

14       And when we pulled up, Johnny Alite was on the phone

15  and signaled to us that the guy -- there was only one guy

16  that went into the -- into the funeral parlor, and so that's

17  when we went in.

18  Q    And the guy that went into the funeral parlor, are you

19  referring to the proprietor?

20  A    Yes.

21  Q    Okay.

22       And, uh, after -- did you see the owner/proprietor go

23  into the funeral parlor?

24  A    No, I didn't see him go in, no.

25  Q    How did Alite communicate to you to go into the funeral

61

1   parlor?

2   A    He was pretending that he was on the phone over there,

3   and when we pulled up and got out of the car, we seen him,

4   and he went like that (indicating) inside, as he was on the

5   phone.

6   Q    And did you then go into the funeral parlor?

7   A    Yes.

8   Q    Now, when you went into the funeral parlor, what, if

9   anything, happened?

10  A    Uh, I went in with the kid.  And we met the guy.  I

11  said, my cousin was here yesterday, somebody in our family

12  died.  I think he said his grandfather, or something.

13       He said, oh, yeah, your cousin called us, this, that

14  and the other thing.

15       He took us downstairs into the basement, and, uh, they

16  were looking at some of the coffins.  In the back is the

17  office.  When we got to the office, that's when I pulled the

18  gun on him.

19  Q    And how old was this gentleman, sir?

20  A    He was -- he was about 60.

21  Q    And who --

22            MR. COROZZO:  Your Honor, may we know who we're

23  talking about; the kid or somebody else?

24  BY MR. TREZEVANT:

25  Q    Is this the proprietor, sir?

62

Page 268

1    A    Yeah, the guy who owned the place.

2    Q    And, uh, what type of gun did you have?

3    A    I had a revolver.

4    Q    Where did you get it, sir?

5    A    Johnny Alite had given it to me.

6    Q    And when you pulled the gun on the individual, uh,

7    what, if anything, did you say to him?

8    A    I says, I want to know where the money is.

9         And he said, uh -- he made this whole thing, oh, oh,

10   what's going on?  I don't know.

11        I says, where's the money?  So I told the guy to -- the

12   other guy who I was with, I says to tie him up.  And I

13   started going, looking along the wall behind the pictures

14   and stuff like that.

15   Q    Now, as far as, uh, tying him up, did he take stuff

16   to --

17   A    Yeah, he had the plastic straps to tie him up behind

18   his back, yeah.  He told him to get on his knees so he

19   couldn't move, you know.  And, uh, he took money out, he

20   gave us his watch, he says, take this.  He says, please

21   don't do anything, don't hurt, whatever.

22        When I couldn't find the wall safe or nothing to it, I

23   got on the -- I got on the walkie-talkie.  I said, it's not

24   behind the picture.

25   Q    Now, sir, when you were in the office was the

63

1   individual -- you said the individual who owned the funeral

2   parlor was put on his knees?

3   A    Yes.

4   Q    And, uh, his hands were bound in front of him or behind

5   him?

6   A    Behind him.

7   Q    And who stayed with him while you looked for the safe?

8   A    Once he was tied up, we were looking in the office.

9   You know, he wasn't moving.  He was staying right there.

10  So, I started looking around the wall behind -- they had,

11  uh, wall paneling and stuff like that.

12  Q    Had the information been provided to you prior to going

13  in that there was, in fact, paneling in there?

14  A    No.  No, I was told that it was just behind the

15  painting that was there.  And, uh, there was nothing behind

16  the painting.

17  Q    So, when you got on the walkie-talkie, who did you

18  speak with?

19  A    I spoke to -- Kevin McMahon and John Alite were

20  together.

21  Q    And did you tell them that you --

22  A    I said, it's not behind the -- the painting.

23       They says, keep looking for it.  Apparently there was a

24  secret safe in there where they kept the money.

25  Q    Did you keep looking?

64

1   A    Yes.

2   Q    Were you able to find it?

3   A    No.  Again, the guy who I was with, he started

4   panicking.  He started screaming that the shit ain't here.

5   He starting cursing and going, you know.  The guy who owned

6   the place, he gets up.  He let's him get up.  And he pressed

7   an alarm, so we had to get out of there.

8   Q    And what did you take with you?

9   A    I think he gave us like -- he gave us his watch and

10  like three or $4,000, something like that.

11  Q    Ms. Lanier is going to approach you and hand you

12  Government's 18B, sir.

13       (Pause)

14       If you would look through this exhibit, sir.

15       (Pause)   (4:45 p.m.)

16  A    Yeah, that's the place.

17  Q    Do you recognize the exhibit?

18  A    Yes.

19  Q    Is it made up of photographs?

20  A    Yes.

21  Q    How many photographs?

22  A    Seven of them.

23  Q    Are they photographs of the funeral parlor, sir?

24  A    Yes.

25  Q    Are they fair and accurate representations?

65

Page 271

1   A     Yes.

2              MR. TREZEVANT:  Your Honor, we'd offer 18B.

3              THE COURT:  Any objections?

4              MR. COROZZO:  Just to make the record clear, fair

5   and accurate representations of what?

6   BY MR. TREZEVANT:

7   Q     Of the inside of the funeral parlor, sir?

8         Mr. Bonner, are they fair and accurate representations

9   of the interior of the funeral parlor?

10  A     Yes.

11             MR. COROZZO:  No objection.

12             THE COURT:  Receive into evidence 18B.

13             (Thereupon, Government's Exhibit 18B was received

14  and filed in evidence.)

15  BY MR. TREZEVANT:

16  Q     What are we looking at here, sir?

17  A     That's the stairs going down to the office.

18  Q     And looking -- that's referring to Bates stamp 1153.

19        Looking at the next photograph --

20        (Pause.)

21        -- 1154, what is this, sir?

22  A     That's the waiting area down there.  That's the waiting

23  area downstairs.  I don't recognize it.  That's the waiting

24  area, but I -- when you go downstairs.

25  Q     Now, looking at the next photograph, 1155?

1   A     Yeah.

2   Q     What is this, sir?

3   A     That's where they had the coffin display.  When you

4   went down the stairs, off to the left there's a coffin

5   display.

6   Q     And did you, uh -- did you go through that area?

7   A     Yeah.

8   Q     Looking at the next, 1157, what is this, sir?

9   A     I'm not sure.  That looks like it's in the office

10  somewhere, but I'm not 100 percent sure of that one.  It

11  looks like the office because of the paneling.

12          MR. COROZZO:  Your Honor, I would object to the

13  photographs.  There are at least two photographs where this

14  witness now says he can't recognize anything.

15          THE COURT:  Well, let's -- do you recognize this?

16          And it's okay if you don't.  Just tell --

17          THE WITNESS:  No, not in the -- not close up like

18  that, no.  No.  I wasn't in there, you know, I mean, looking

19  around, I was --

20          THE COURT:  Why don't we pull this particular

21  photograph.

22          MR. TREZEVANT:  We will, Your Honor.

23          MR. COROZZO:  And I believe the waiting area, the

24  witness said he didn't recognize.

25          THE COURT:  I didn't catch that.

67

1           Would you put that up again, and let's ask him,

2    Mr. Trezevant.

3    BY MR. TREZEVANT:

4    Q    Yes, sir -- yes, ma'am.

5         Did, uh -- Mr. Bonner, in front of you do you have a --

6    well, rather than put it up, how about, do you have Bates

7    stamp 1154 in front of you?

8    A    Yes.

9    Q    How about this:  Could you flip through that exhibit

10   and tell us what photographs, if any, you do recognize.

11   A    All right.  1153, 1155, 1156, 1158, and 1159.

12        MR. TREZEVANT:  And Your Honor, we would offer the

13   exhibit without the other photographs and we will remove

14   those when we're done.

15        THE COURT:  All right.

16        MR. COROZZO:  No objection.

17        THE COURT:  Thank you.

18        I'll receive those into evidence.

19        (Thereupon, Government's Redacted Exhibit 18B was

20   received and filed in evidence.)

21   BY MR. TREZEVANT:

22   Q    Looking at 1158, sir, what are we looking at here?

23   A    That's the offices.

24   Q    And is this the wood paneling to which you referred?

25   A    Yes.

68

1  Q    Now, what were you looking -- did you say you looked

2  behind the different pictures?

3  A    Yeah, he had -- up on this wall coming towards me, he

4  had some pictures on that wall.  And apparently that's where

5  the, uh, safe was supposed to be, behind there.

6  Q    And when you couldn't find a safe, is that when you got

7  on the walkie-talkie?

8  A    Yes.

9  Q    And 1159.

10 A    That's the stairs going up.

11 Q    All right.

12      And so, what was the total take, sir?

13 A    About three or 4,000, plus the watch.

14 Q    Now, when you came -- you can go back to the --

15      (Pause.)

16      When you came out of the funeral parlor, looking at

17 Government's 18A1, do you recognize where the funeral parlor

18 is on this exhibit, sir?

19 A    Yes, on the corner.

20 Q    When you came out of funeral parlor, sir, did you get

21 in a car?

22 A    Yeah, I got in the car that, uh, Patsy Andriano was

23 driving.

24 Q    Where was the car parked when you came out?

25 A    He had moved the car from the -- from this street he

69

Page 275

1   had moved the car over and he parked on the corner, on

2   Grand Avenue.

3   Q     And what about the individual that was with you?

4   A     The -- yeah, we both got in the car that Patsy was

5   driving, yes.

6   Q     And then where did you all go, sir?

7   A     We went to Claudia's house -- her mother's house.

8   Q     Claudia DiPippa?

9   A     In Howard Beach, yes.

10  Q     Now, when you got there, sir, uh, what, if anything,

11  occurred?

12  A     I -- I told John, I says, the guy started -- he started

13  flipping out.  I says --

14  Q     Who were you talking about?

15  A     I was speaking about the guy who they paired me with,

16  who they put on the job.  I says, the guy started to going

17  crazy.  I says, we didn't have enough time because he kept

18  going crazy.  The guy -- the old man who we -- the older guy

19  who owned the place seen this guy going crazy and he caused

20  even more chaos, the guy.  You know, he started screaming.

21       Kevin McMahon was there with Johnny Alite, he confirmed

22  it, because when I -- when I got on the walkie-talkie and I

23  told him that the -- it's not behind the picture, he says,

24  I -- when we were by Claudia's mother's house, he -- he

25  says, I heard him, John, he was going crazy.

70

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

-vs-

RONALD J. TRUCCHIO
 a/k/a RONNIE ONE ARM
STEVEN CATALANO
KEVIN M. McMAHON
TERRY L. SCAGLIONE,
        Defendants.
-------------------------------/

Case No. 8:04-CR-348-T-24TGW
9 November 2006
Tampa, Florida
9:30 a.m.

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE
(Trial Testimony of Kevin Bonner.)

APPEARANCES:

| | |
|---|---|
| For the Government: | DENNIS MOORE, ESQUIRE<br>JAY G. TREZEVANT, ESQUIRE<br>Assistant United States Attorneys<br>United States Attorney's Office<br>400 North Tampa Street, Suite 3200<br>Tampa, Florida 33602<br>(813) 274-6000 |
| For the Defendant<br> Ronald Trucchio: | JOSEPH R. COROZZO, ESQUIRE<br>Rubinstein & Corozzo, PC<br>260 Madison Avenue<br>New York, New York 10016<br>(212) 545-8782<br>GEORGE J. VILA, ESQUIRE<br>Law Office of George<br> J. Vila<br>1221 Brickell Avenue<br>Suite 1020<br>Miami, Florida 33131<br>(305) 373-5707 |

PAUL K. SPANGLER, RMR
OFFICIAL UNITED STATES COURT REPORTER

71

Page 45

1   A   No.

2   Q   Childhood friend of yours, right?

3   A   Yes.

4   Q   Did you ever commit a crime with Ron Trucchio?

5   A   No.

6   Q   Did you ever discuss a crime with Ron Trucchio?

7   A   No.

8   Q   Did you ever commit a crime on the orders of

9   Ron Trucchio?

10      (Pause)

11  A   Not that I'm aware of, no.

12  Q   How many times in your life have you actually --

13  outside of this courtroom -- have you seen Ron Trucchio?

14  A   I used to live in the neighborhood, I seen him a lot.

15  Q   Used to live in Woodhaven, right?

16  A   And Ozone Park, yeah.

17  Q   You lived in Ozone Park.

18      When did you move out of Ozone Park?

19  A   I moved out of Ozone Park when I was a kid.

20  Q   Eleven years old, right?

21  A   When I say --

22  Q   When you say -- please answer my question first and

23  then we'll allow you to say what you want.

24      You moved out of Ozone Park at 11 years old, right?

25  A   Yes, sir.

1          THE COURT:  Now, is there something you would like

2     to say?

3     BY MR. COROZZO:

4     Q     Now you can say what you want to say.

5     A     Yeah.

6          Woodhaven and Ozone Park are right next to one another.

7     People in Woodhaven hang out in Ozone Park; people in Ozone

8     Park hang out in Woodhaven.  It's a -- it's -- you know,

9     everybody knows one another.

10    Q     So, when people -- back in the eighties when people

11    said "my neighborhood," they would refer to Woodhaven and

12    Ozone Park as the same neighborhood?

13    A     Uh, there were guys that claimed certain street corners

14    and certain areas of Woodhaven and Ozone Park and South

15    Ozone Park and Brooklyn, parts of Brooklyn over there.

16         But this was when we were teenagers, you know.  As you

17    got older, uh, everybody started to do business with

18    everybody from the different neighborhoods, yeah.

19    Q     But when you're teenagers growing up in your

20    neighborhood, your neighborhood was Woodhaven, and you

21    considered that separate from Ozone Park, correct?

22    A     Yes.

23    Q     So, when you were growing up in the neighborhood of

24    Woodhaven, you didn't see Ron Trucchio, right?

25    A     Yeah, I seen him.  I would see him hanging out on 101st

1   Avenue in front of the clubs.

2   Q   So, prior to 1985, when you're a teenager, you would go

3   to 101st Avenue?

4   A   Yes.

5   Q   Where?

6   A   When?

7   Q   Where would you go?

8   A   I would stop at the pizzeria, I'd stop at 77th Street

9   to talk to the guys that I knew over there.   I had a

10  girlfriend over there.

11  Q   You were friendly with the guys from 77th Street,

12  right?

13  A   Yeah, a few of them.

14  Q   77th Street Boys, that gang?

15  A   Yes.   My uncle lived up the block, 78th Street.

16  Q   Now, outside of just seeing Ron Trucchio, how many

17  times have you actually been in his presence?

18  A   I don't know, maybe ten times.

19  Q   When was the last?

20  A   The last time I was up there was '96, the last time I

21  seen him.

22  Q   How many times have you ever had a conversation with

23  Ron Trucchio?

24  A   Didn't have too many deep conversations with him.

25  Q   How many times did you have any conversation with him?

74

1   Q     All right.

2         You believed everything John Alite told you --

3              MR. TREZEVANT:  Objection, Your Honor, asked --

4   BY MR. COROZZO:

5   Q     -- about Ron Trucchio, correct?

6              MR. TREZEVANT:  Asked and answered.

7              MR. COROZZO:  That was -- the question that was

8   never asked.

9              THE COURT:  Yes, it's a different question.

10             Would you answer the question.

11             THE WITNESS:  I believed for the most part what he

12  was telling me was the truth, Johnny Alite, yes.

13  BY MR. COROZZO:

14  Q     Okay.

15        Now, answer my question, because that's not responsive

16  and it's vague.

17             MR. TREZEVANT:  Objection, Your Honor.

18  BY MR. COROZZO:

19  Q     Did you not believe --

20             THE COURT:  I'm sorry, yes.

21             Mr. Corozzo, don't talk, just ask questions.

22  BY MR. COROZZO:

23  Q     Did you or did you not believe everything John Alite

24  told you about Ron Trucchio?

25  A     I believed everything, yeah.

1    BY MR. COROZZO:

2    Q    Now, when you testified on direct examination about

3    your understanding of certain things, uh, a lot of that

4    testimony was based solely on what John Alite told you,

5    right?

6    A    It was certain things that were based solely on that.

7    There were other things that were based on what I seen, a

8    combination of John telling me and what other people had

9    mentioned.

10   Q    Okay.

11        How many times were you in Billy Kaso's company between

12   '93 and '97?

13   A    I never bothered with the guy.  I never -- I was never

14   with him.  I never seen him.

15   Q    You were never in his company?

16   A    No.

17   Q    Okay.

18        Based upon your understanding of your relationship with

19   John Alite, between 1993 and 1998, who were the people

20   closest to John Alite?

21   A    His cousin, Patsy Andriano, Mark, uh, Mike Malone, uh,

22   Malone's brother.  He had this guy from -- he had this guy

23   from Jersey with him.  Uh, myself, when he came down here,

24   and Ronnie.

25   Q    Ronnie Trucchio?

76

Page 212

1   A    Yes.

2   Q    He was very close to Ronnie Trucchio as far as you knew

3   in the nineties, right?

4   A    Yes.

5   Q    You didn't see them together, right?

6   A    No -- no.

7   Q    So, that's based solely on what John Alite's telling

8   you, right?

9   A    Yes.

10  Q    It's hearsay from John Alite, right?

11  A    Yes.

12           MR. COROZZO:  Can I have that stricken,

13  Your Honor?

14           THE COURT:  You asked the question.  No.   There

15  was no objection.

16  BY MR. COROZZO:

17  Q    Okay.

18       How often did John Alite tell you he was in

19  Ron Trucchio's presence in the nineties?

20  A    How often did he --

21  Q    He tells you he was so close.  How often did they see

22  each other?

23  A    Well, he didn't talk like that.  He didn't say like

24  that.

25  Q    He told you one of my closest friends is Ron Trucchio,

77

Page 232

1    BY MR. COROZZO:

2    Q    You used the term "particular."  Did you testify

3    about --

4              MR. TREZEVANT:  Objection, Your Honor.

5              THE COURT:  Mr. Corozzo, let's move on.

6              Let's move on.

7    BY MR. COROZZO:

8    Q    So, when you asked John Alite on the phone if he got

9    the okay from upstairs, what did he say?

10   A    He said, yeah.

11   Q    And you understood that to mean Ron Trucchio?

12   A    Yes.

13   Q    Now, is it your understanding that in -- sometime in

14   '92 or '93 now Ron Trucchio, uh, is in charge of the Alite

15   group?

16   A    Uh, it was my understanding that at that time that --

17   that Johnny Alite was answering to Ronnie One-Arm, yeah.

18   Q    Is that a yes?

19   A    Yes.

20   Q    Okay.

21        And it is your understanding -- is it your

22   understanding that John Alite's crew is under the control of

23   Ron Trucchio from 1992 until the time you are out of the

24   crew in 1997?

25   A    Again, by extension, yes.

1    Q    Please don't qualify.

2         Can you answer the question?

3         I'll withdraw, I'm sorry, Your Honor, for being

4    argumentative.

5         Can you answer this question yes or no, and if you

6    can't, I'll ask it in a different way:  Was the John Alite

7    crew with Ron Trucchio between 1992 and 1997?

8    A    Yes.

9    Q    Okay.

10        And everyone in the screw knew that, as far as your

11   understanding was, right?

12   A    Yes.

13   Q    Mike Malone knew that, right?

14   A    Yes.

15   Q    Billy Kaso knew that, right?

16            MR. TREZEVANT:  Objection as to speculation,

17   Your Honor.

18            THE COURT:  I'll sustain.  I'm not sure he would

19   know what Billy Kaso knew, or even what Mike Malone knew.

20            So, I will sustain.

21            We're going to take a recess.  We're going to be

22   in recess until 3:20.  You're welcome to walk around.

23   Please don't discuss the case.

24            THE BAILIFF:  Rise for the jury.

25            THE COURT:  And you may step down, and please

79

1          THE COURT:  Well, maybe it will be a new question.

2          If it's a new question --

3    BY MR. COROZZO:

4    Q    Thank you, Your Honor.

5         In addition to speaking to Joe O'Kane -- I'm sorry --

6    in addition to speaking to John Alite about whether there

7    was approval from upstairs, were you present when similar

8    conversations were had with any of the other people involved

9    in that robbery?

10   A    No.

11   Q    So, the only communications that you were involved in

12   in reference to, uh, getting the okay from upstairs were

13   between you and John Alite alone, correct?

14   A    That's correct.

15   Q    And the only person that told you that Ronnie Trucchio

16   had your back in the case of a problem was John Alite,

17   correct?

18   A    That's correct.

19   Q    Never discussed it with anybody else, right?

20   A    No.

21   Q    No other corroboration or any other evidence that you

22   have to suggest that was true, correct?

23   A    That's correct.

24   Q    Now, the proceeds of that robbery were how much?

25   A    Uh, Joe O'Kane?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

                                    Case No. 8:04-CR-348-T-24TGW
-vs-                                29 November 2006
                                    Tampa, Florida
                                    12:55 p.m.

RONALD J. TRUCCHIO
 a/k/a RONNIE ONE ARM
STEVEN CATALANO
KEVIN M. McMAHON
TERRY L. SCAGLIONE,
          Defendants.
-------------------------------/

            TRANSCRIPT OF TRIAL PROCEEDINGS
      BEFORE THE HONORABLE SUSAN C. BUCKLEW,
        UNITED STATES DISTRICT COURT JUDGE
              (VERDICT OF THE JURY.)

APPEARANCES:
For the Government:          DENNIS MOORE, ESQUIRE
                             JAY G. TREZEVANT, ESQUIRE
                             Assistant United States Attorneys
                             United States Attorney's Office
                             400 North Tampa Street, Suite 3200
                             Tampa, Florida 33602
                             (813) 274-6000

For the Defendant
 Ronald Trucchio:           JOSEPH R.COROZZO, ESQUIRE
                             Rubinstein & Corozzo, PC
                             260 Madison Avenue
                             New York, NY 10016
                             (212) 545-8782

For the Defendant
 Steven Catalano:           THOMAS OSTRANDER, ESQUIRE
                             Law Office of
                               Thomas H. Ostrander, P.A.
                             516 10th Street West
                             Bradenton, Florida 34205
                             (941) 746-7220

            PAUL K. SPANGLER, RPR, RMR, CRR
        OFFICIAL UNITED STATES COURT REPORTER

1        Count 1 of the Superseding Indictment:

2        As to the offense of conspiracy to conduct or

3   participate in the conduct of an enterprise either through a

4   pattern of racketeering activity or through the collection

5   of an unlawful debt, in violation of 18, United States Code,

6   Section 1962(d),

7        We, the Jury, find the defendant,

8   Ronald J. Trucchio:

9        Guilty.

10       (Pause)

11       The defendant, Ronald J. Trucchio, and one or more

12  members of the criminal crew during the conspiracy charged

13  in Count 1 of the Superseding Indictment, knowingly and

14  intentionally distributed and possessed with intent to

15  distribute five kilograms or more of a mixture or substance

16  containing a detectable amount of cocaine, a controlled

17  substance, all in violation of Title 21, United States Code

18  Section 841.

19       Yes.

20       The defendant, Ronald J. Trucchio, and one or more

21  members of the criminal crew during the conspiracy charged

22  in Count 1 of the Superseding Indictment, knowingly and

23  intentionally conspired to distribute and to possess with

24  intent to distribute five kilograms or more of a mixture or

25  substance containing a detectable amount of cocaine, a

1    controlled substance, all in violation of Title 21, United

2    States Code, Section 846.

3              Yes.

4              So say we all, this 29th day of November, 2006,

5    Helayne Schreiber, foreperson.

6              THE COURT:  We have Mr. Trucchio.

7              Leida, would you like me to read them?

8              THE DEPUTY CLERK:  Just have a raspy voice.

9              THE COURT:  No, it's fine.

10             THE DEPUTY CLERK:  Thank you -- thank you,

11   Your Honor.

12             THE COURT:  Yes.

13             Mr. Catalano, would you stand.

14             THE DEPUTY CLERK:  In the case of the

15   United States of America versus Steven Catalano, Case Number

16   8:04-Criminal-348-Tampa-24TGW.

17             Verdict:

18             Count 1 of the Superseding Indictment:

19             As to the offense of conspiracy to conduct or

20   participate in the conduct of an enterprise either through a

21   pattern of racketeering activity or through the collection

22   of an unlawful debt, in violation of 18, United States Code,

23   Section 1962(d),

24             We, the Jury, find the defendant, Steven Catalano:

25             Guilty.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                              Case No. 8:04-CR-348-T-24TGW
-vs-                         2 March 2007
                              Tampa, Florida
                              8:40 a.m.

RONALD J. TRUCCHIO,

       Defendant.
-------------------------------/

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE SUSAN C. BUCKLEW,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:           JAY G. TREZEVANT, ESQUIRE
                             Assistant United States Attorneys
                             United States Attorney's Office
                             400 North Tampa Street, Suite 3200
                             Tampa, Florida 33602
                             (813) 274-6000

For the Defendant
 Ronald Trucchio:            JOSEPH R. COROZZO, ESQUIRE
                             Rubinstein & Corozzo, PC
                             260 Madison Avenue
                             New York, NY 10016
                             (212) 545-8782

For the Defendant
 Steven Catalano:           THOMAS OSTRANDER, ESQUIRE
                             Law Office of
                               Thomas H. Ostrander, P.A.
                             516 10th Street West
                             Bradenton, Florida 34205
                             (941) 746-7220
                             (941) 747-1526

For the Probation Dept.: BETH GLOVER

Reported By:                PAUL K. SPANGLER, RPR, RMR, CRR
                             Official Court Reporter
                             Certificates of Merit and

1            MR. TREZEVANT:  In the PSR, Your Honor?

2            THE COURT:  Yes.

3            The first group is the drug distribution.  Well,

4    let me just say up front, Mr. Trucchio has withdrawn the

5    objections to the firearm enhancement, so I will not be

6    specifically addressing those.

7            And the Government has withdrawn its argument that

8    the robbery of Ernie Haire at Thee Dollhouse be attributable

9    to Mr. Trucchio, so I'm not going to address that.

10           The first one is group one, which is the drug

11   distribution.  And I believe that it is correctly scored.

12           There were several objections in this.  One was --

13   well, maybe there ended up being only one -- but one was to

14   the amount of drugs that Mr. Trucchio is held accountable

15   for.

16           The Presentence Report suggested that he should be

17   held accountable for 15 kilograms or more of cocaine.  The

18   jury found five kilograms or more of cocaine he should be

19   held accountable.

20           For Mr. Corozzo made the argument that I should

21   only hold him accountable for five, and I think that would

22   be a base offense level of 32.  But I disagree, I think the

23   Government's argued this morning, and then I went back and

24   reviewed the transcripts, that there was numerous testimony,

25   or a lot of testimony about drugs.

1          Bonner said that he sold cocaine for Alite, which

2   I find is foreseeable to be attributable to Trucchio in the

3   early '80s, made about $2,000 a week.

4          O'Kane, I think -- I believe it was Ciaccio said

5   that he saw O'Kane with two kilos, saw Alite with

6   three kilos.  O'Kane said he was selling a large amount of

7   cocaine.  One -- or he said -- he didn't say -- but it was

8   said that O'Kane was selling one-half kilo to one-fourth

9   kilo a week during the 1986, '87, '88 time frame.

10          Even -- I think 15 kilos is a conservative

11   estimate, and I think the probation officer has correctly

12   scored it, and the rest of the enhancements I also think are

13   appropriate.

14          The next one is the attempted murder of

15   Michael Livigni.  That's group two.  And again, I think it's

16   correctly scored.

17          Mr. Corozzo made the argument that it was not

18   really an attempted murder, it was an assault, and therefore

19   the guidelines would change.  And I disagree, I think it is

20   an attempted murder.

21          Mr. Livigni was shot in the stomach, that it was

22   not an assault, it was a serious life-threatening bodily

23   injury.  The four-level increase is correct.  The attempted

24   murder guideline is correct, and so I will find that is

25   correctly scored and foreseeable and attributable to

1   Mr. Trucchio.

2           The next one is group three, which is the robbery

3   of Joseph O'Kane.  I think there was some testimony that

4   Mr. Trucchio had their back, the time frame was 1994, it was

5   protecting the drug business.

6           The six-level increase, I think, is appropriate in

7   this case, and I will find it appropriate in the other

8   cases -- or the other counts or the other acts, rather than

9   the five-level.  The firearm was pointed, there was a

10  threat, so I think it is -- it is appropriate, and it's

11  correctly scored.

12          Group four is the attempted extortion of

13  Timmy Donovan.  And this was 1995, and this had to do with

14  Mr. Alite, among others.  There was no -- no evidence that

15  Mr. Trucchio was involved in this, and I don't find this

16  foreseeable to Mr. Trucchio.  So, I did not hold him

17  accountable for the extortion of Timmy Donovan.

18          The next one is group five, and this is the

19  robbery of the Sky King Fireworks.  This occurred in 1995

20  down in South Florida.  Mr. Trucchio was not physically

21  involved, in that others committed the robbery of the

22  Sky King fireworks.

23          However, I think it was foreseeable, and I think

24  that's -- that's especially -- the reason I'm making that

25  assumption is because after the fact, he was -- he told them

1   to lay off -- told Alite to layoff Willie Micco, who

2   apparently was the owner of the Sky King Fireworks.  So,

3   it's clear that he was involved.  So, I find that is

4   foreseeable to him and correctly scored.

5          The next is the robbery of the Sears store in 1995

6   in Vineland, New Jersey.  I too find this is correctly

7   scored, with the exception that there should only be a

8   three-level increase for the knife as opposed to a

9   four-level increase.

10          And I realize there was one witness that did not

11   testify about any money being delivered to Trucchio, but

12   there was another witness that did, and I credit that

13   witness's testimony.

14          So, I think that is correctly scored.

15          The robbery of the funeral home -- sorry -- is

16   also 1995.  It is -- I also felt that this should be

17   attributable to Mr. Trucchio, McMahon and Alite, I

18   believe -- no, I'm sorry, let me go back.

19          I apologize, let me go back.  Yes, this is the

20   one, I'm sorry.  This is the one where the testimony was --

21   and it wasn't Alite, the part -- I had the players wrong --

22   but the testimony was that Ronnie has our back in this.

23          And so, again, there is some foreseeability of his

24   involvement with the robbery.  It was 1995 of the funeral

25   home.

1          The robbery in Port Saint Lucie of the tailor, I

2    did not see this as being foreseeable to Mr. Trucchio, and I

3    did not think he should be held accountable for that.

4          I won't address Thee Dollhouse, since Thee

5    Dollhouse is not involved and has been withdrawn.

6          The murder of Johnny Gebert in Queens.  And this

7    was objected to by Mr. Corozzo as not being foreseeable to

8    Mr. Trucchio.

9          Mr. Trezevant argued, I guess, two things:  That

10   circumstantial evidence pointed to the fact that Trucchio

11   was involved protecting his drug dealing and his drug

12   business; or -- or "and" -- it was also reasonably

13   foreseeable that Alite could commit the murder over a drug

14   dispute.

15         Well, you know, I think that there was also

16   testimony, and the testimony as I recall it was that Alite

17   had a grudge against Johnny Gebert.  I just thought the

18   evidence was too tenuous here to hold Mr. Trucchio

19   accountable for the murder of Johnny Gebert.

20         I didn't see that the circumstantial evidence

21   pointed to it, and I have a hard time finding that the

22   murder would be attributable or foreseeable to Mr. Trucchio.

23   So, I did not hold him accountable for that.

24         The next one is the group 11, I believe, which is

25   the assault of Bill Kaso.  I did hold him accountable for

Page 103

1    that.  I did feel that that was correctly scored.

2             I think Kaso asked Trucchio, or the evidence was

3    that if he wanted some cocaine in the bathroom at a wedding,

4    and -- and that was somehow an insult.  And as a result,

5    they beat up Billy Kaso, meaning others, with a baseball

6    bat.

7             So, is it foreseeable?  Yes.

8             Is the -- are the guidelines correctly scored?

9    One -- one difference.  There's a five-level increase for

10   serious bodily injury.  Billy Kaso, although he was beat up

11   with a baseball bat, didn't go to the hospital, didn't seek

12   medical attention, so I thought it was more properly scored

13   as a three-level increase for the injury that was sustained.

14             The next one is the group 12, which is the assault

15   of Joseph O'Kane.  I thought that should be attributable to

16   Mr. Trucchio, and I thought it was correctly scored.

17             The attempted extortion of Costello, I did not

18   find that attributable or foreseeable to Trucchio.  The old

19   man in the pizza parlor, maybe, but I thought that was too

20   tenuous, so I did not hold him accountable for that.

21             So, it makes a little difference in the

22   guidelines, and Ms. Glover has helped me with that.  So,

23   Ms. Glover maybe -- do you want to go through that, or do

24   you want me to go through that?

25             THE PROBATION OFFICER:  I'll be happy to,

1    Your Honor.

2            The multiple count adjustment, paragraph 164,

3    group one is 40, and the unit assigned to that is one.

4            Paragraph 165, group two, that's the attempted

5    murder.  The total offense level is 41, and the unit

6    assigned to that is one.

7            Group three is the robbery.  It's a total offense

8    level of 33, and there's one-half unit assigned to that.

9            Paragraph 164 is not considered.

10           Paragraph 168 remains the same.

11           Paragraph 169, the offense level is a 28, and zero

12   units are applied.

13           Paragraph 170 remains the same.

14           Paragraph 8 -- I'm sorry, group eight -- eight,

15   nine, ten are not considered.

16           At paragraph 174, group 11, that total becomes 25,

17   and there's zero units assigned to that.

18           Paragraph 175, group 12, remains the same.

19           Paragraph 176 is not considered.

20           Paragraph 177, the greatest of the adjusted

21   offense level from above is 41.

22           There are a total of two-and-a-half units in the

23   guidelines at 3D1.4 allowing for an increase of three

24   levels.  So the combined adjusted offense level is 44.  With

25   no acceptance for responsibility, the total becomes 44.

1            MR. COROZZO:  Your Honor, there might be one

2    mistake.

3            THE COURT:  Okay.  I was looking at something too.

4    Just give me a second and then I'll hear from you.

5            (Pause.)

6            Maybe I misunderstood.  What was paragraph 169?  I

7    mean, I know what it was, it was the Sears store.

8            THE PROBATION OFFICER:  It's a 28 now.  We reduced

9    the use of the weapon one level.

10            THE COURT:  But it was originally a 20, at least

11    that's what it looks like on mine.  Maybe I'm not reading it

12    correctly.

13            THE PROBATION OFFICER:  I believe it's the Sears

14    store.

15            (Pause.)

16            THE COURT:  It was a 29.

17            THE PROBATION OFFICER:  I'm getting there,

18    Your Honor.  The base offense level was a 20, but the total

19    at the end was 29.

20            THE COURT:  Okay.  I just -- I'm not reading mine

21    correctly, I apologize.  I've got a line through it.  It

22    looks like a 20, but it was a 29?

23            THE PROBATION OFFICER:  Yes, ma'am.

24            THE COURT:  Okay.

25            THE PROBATION OFFICER:  And rather than give a

1    four-level for the dangerous weapon being otherwise used, we

2    only adjusted it three levels.

3              THE COURT:  Okay.

4              Mr. Corozzo.

5              MR. COROZZO:  I might have made a mistake,

6    Your Honor.  I don't see it.  I don't believe there is a

7    mistake.  I'm not sure.  My math is a little confused.  But

8    maybe we can run through it one more time.

9              THE COURT:  Sure, and I'll do it this time.

10             And Ms. Glover, you correct me if I make a

11   mistake, because that was the only difference I had, was

12   what I said.

13             All right.  Group one, the drug group.  Adjusted

14   offense level is a 40.  And it now gets a one unit instead

15   of a half-unit.

16             Group two, which is the attempted murder of

17   Michael Livigni, and I'm not going to go through and

18   identify each of these except the high ones, is a 41.  And

19   it now, instead of a half, gets one.  And that's because of

20   we've taken out the murder.

21             Group three is a 33, and it now gets a half.

22             Group four is not considered any longer.

23             Group five is a 32, and it gets nothing.

24             Group six, which is the Sears store, is now a 28

25   instead of a 29.  But nothing.  You know, it doesn't make

1   any difference.

2           Group seven, the adjusted offense level, is a 32.

3   It's the same, still a zero.

4           Group eight is -- I did not consider.

5           Group nine was the one that the Government

6   actually withdrew, and those were zeros anyway.

7           Group ten, this was the murder, and it comes out,

8   and so it's no longer the highest offense level.

9           Group 11 is now a 25, but it still gets zero.

10          Group 12 is a 27, and it gets a zero.

11          Group 13 is out.

12          And I came up with the same total number.

13          MR. COROZZO:  On that calculation I agree,

14  Your Honor.

15          MR. TREZEVANT:  Yes.

16          THE COURT:  Forty-one plus three would be 44.

17          Mr. Trezevant.

18          MR. TREZEVANT:  Yes, ma'am, we agree.

19          THE COURT:  I'm not asking you if you agree with

20  my rulings, I'm just asking you if you agree with the

21  calculations?

22          MR. TREZEVANT:  Yes, ma'am.

23          THE COURT:  Okay.

24          All right.  Now, there was an objection regarding

25  the criminal history, that some of paragraphs 136 -- I'm

1   sorry, I said that wrong -- 186 and 187 and 188 should not

2   be scored in this.  188, because that's the Southern

3   District case, and Mr. Corozzo argued that the conduct -- or

4   a lot of the conduct was one and the same.

5        The other two, I think, had to do primarily with

6   the timing, the time frame.  The attempted assault in Queens

7   County, which occurred on or about December of '88, and the

8   attempted enterprise corruption, which occurred on or about

9   December the 9th, 2002.

10        And these are prior convictions.  I don't agree

11   that he's being held accountable for the same conduct as the

12   Southern District, and I think we've addressed that before,

13   so I think 188 ought to be scored.

14        I -- these are prior convictions as far as two --

15   as far as the attempted enterprise and the attempted

16   assault, so I think they're properly scored.  So, I would

17   overrule that objection.  I know of no reason not to score

18   them.

19        Now, because Mr. Trucchio scores out so high, I'm

20   not sure there's going to be a 3553 argument.  But

21   Mr. Corozzo, I'll give you an opportunity to say anything

22   else you would like to say.

23        And one other issue that I just will bring to your

24   attention, or ask about, is restitution.  What is your

25   position on restitution?